BEROMUN AKTIENGESELLSCHAFT,
Petitioner,

v.

SOCIETA INDUSTRIALE AGRICOLA
"TRESSE" DI DR. DOMENICO E DR.
ANTONIO DAL FERRO, and American
Arbitration Association, Respondents.

78 Civ. 3413 (HFW).

United States District Court,
S. D. New York.

April 3, 1979.

Katz, Wittenberg, Levine & Silverman,
New York City (Bennet Hugh Silverman,
New York City, of counsel), for petitioner
Beromun.

Pavia & Harcourt, New York City (David
Botwinik, Robert S. Ordman, New York
City, of counsel), for respondent Societa.

**1164**

## OPINION

WERKER, District Judge.

Petitioner Beromun Aktiengesellschaft ("Beromun"), a Liechtenstein corporation, commenced suit against respondents Societa Industriale Agricola "Tresse" Di Dr. Domenico E Dr. Antonio Dal Ferro ("SIAT"), an Italian partnership, and the American Arbitration Association ("AAA")[1] seeking an order directing SIAT to proceed to arbitration. SIAT cross moved to dismiss Beromun's petition on grounds of lack of subject matter and personal jurisdiction, failure to comply with the statute of frauds, failure to state a claim, and forum non conveniens.

Beromun contends that it entered into a contract to sell a quantity of corn to SIAT, that the contract contained an agreement to arbitrate which included a consent-to-personal-jurisdiction clause, and that SIAT breached the contract and must now proceed to arbitration. Alternatively Beromun asserts that several later written communications from SIAT to Beromun constitute enforceable agreements to arbitrate the subject matter of the alleged contract. For the reasons set forth below I have determined that no enforceable agreement to arbitrate exists. Therefore the petition must be dismissed for lack of subject matter and personal jurisdiction.

Beromun argues that it has an agreement with SIAT to arbitrate that falls within the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "Convention"), 3 U.S.T. 2517, T.I.A.S. No. 6997, 330 U.N.T.S. 38, as implemented by the Federal Arbitration Act, 9 U.S.C. §§ 201–08 (1978 Supp.).

Article II, section 1 of the Convention provides that contracting states shall recognize a written agreement to submit to arbitration disputes arising out of a defined legal relationship, whether or not contractual in nature. Article II, section 2 defines an agreement in writing as including "an arbitral clause in a contract or an arbitration agreement, signed by the parties or contained in an exchange of letters or telegrams." In acceding to the Convention the United States adopted the reservation clause contained in Article I, section 3 of the Convention, to wit, that the Convention will apply "only to differences arising out of legal relationships, whether contractual or not, which are considered as commercial . . . ." Thus section 202 of the Arbitration Act provides that "[a]n arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title, falls under the Convention."[2] Section 2 of title 9 acknowledges as valid any "written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal . . . ." Finally, to facilitate the submission of disputes to arbitration, 9 U.S.C. § 203 gives the district courts original jurisdiction, without regard to the amount in controversy, over any "action or proceeding falling under the Convention . . . ." Beromun invokes the court's jurisdiction under this section and seeks an arbitration order pursuant to 9 U.S.C. § 206.[3]

---

1. The AAA is not participating in the instant motion and has advised the court that it will abide by any order that issues.

2. An agreement or award arising out of a relationship entirely between American citizens does not fall under the Convention unless there is a reasonable nexus with a foreign state. 9 U.S.C. § 202. Since both Beromun and SIAT are foreign entities, an agreement to arbitrate, if any, is encompassed within section 202.

3. Section 206 provides:

 Order to compel arbitration; appointment of arbitrators. A court having jurisdiction under this chapter may direct that arbitration be held in accordance with the agreement at any place therein provided for, whether that place is within or without the United States. Such court may also appoint arbitrators in accordance with the provisions of the agreement.

If there is in fact an agreement to arbitrate, section 203 is properly asserted as the jurisdiction-giving statute by virtue of section 202. Section 202 would be satisfied since any existing agreement to arbitrate between Beromun and SIAT arises from a commercial relationship, i. e., the subject sale of corn, *Siderius v. Compania de Acero del Pacifico, S.A.*, 453 F.Supp. 22, 24 (S.D.N.Y.1978), and because the contested agreement is between two foreign entities. Note 2, *supra*; *Metropolitan World Tanker v. P.N. Pertambangan*, 427 F.Supp. 2, 4 (S.D.N.Y.1975); *Antco Shipping Co. v. Sidermar S.p.A.*, 417 F.Supp. 207, 215 (S.D.N.Y.1976), *aff'd without opinion*, 553 F.2d 93 (2d Cir. 1977). The central issue of this litigation is whether a written agreement to arbitrate existed within the meaning of section 202 under the facts presented.

## FACTUAL BACKGROUND

On the afternoon of Friday, October 4, 1974, Beromun purchased 25,000 long tons of American yellow corn for export during March 1 to March 20 of 1975. This transaction was consummated when Beromun's general agent in Italy, Societa Italiana Prodetti Arena S.p.a. ("SIPA") agreed to buy the corn from Koninklijke Bunge B.V. through an Italian grain broker, Enrico Marchetti ("Marchetti"). Marchetti does business under the trade names General Grain Company Establishment ("GGC") when negotiating international sales, and Margrain when dealing in the domestic Italian market.

Following the conclusion of the above deal, Ferruccio Zanghellini ("Zanghellini"), SIPA's trading officer, telephoned instructions to Marchetti to resell the aforesaid quantity of corn purchased earlier in the day by SIPA for Beromun. All resale terms were to be the same as the original sale terms, except that the resale price was adjusted upward.

Prior to the receipt of SIPA's directions to resell, Marchetti had spoken by telephone with defendant SIAT's principal, Dr. Antonio Dal Ferro ("Dal Ferro"), concerning several quantities of corn that Marchetti had for sale. Marchetti affid. at 3. After Marchetti spoke with Zanghellini, he once again communicated with Dal Ferro by telephone on Friday afternoon. The two discussed market conditions, and Marchetti informed Dal Ferro that he had 25,000 long tons of American corn available for sale at $166.00 per metric ton, the price stipulated by Zanghellini, and on other terms and conditions set forth in Exhs. 2 & 3.[4] Marchetti affid. at 3. According to Marchetti, Dal Ferro asked him to "save something for me," whereupon Marchetti explained that all that was available was the 25,000 ton quantity. Dal Ferro told Marchetti to "make it." *Id.* thereafter Marchetti called Zanghellini to tell him he had a buyer and sent identical telexes[5] to SIPA and SIAT on the evening of the same day. Those telexes provided in relevant part:

CONFIRM FOLLOWING BUZ CONCLUDED TODAY THRU GGC

| | |
|---|---|
| SELLERS: | BEROMUN AG TRIESEN |
| BUYERS: | SIAT SAS—THIENE |
| QUANTITY: | 25.000LT 5–0/0 MORE OR LESS AT VESSELS OPTION TOLERANCE AS PER NEWEST NAEGA N.2. ONE VESSEL |
| QUALITY: | U.S. 3 YELLOW CORN 15.5% MOISTURE MAXIMUM. QUALITY FINAL AT TIME AND PLACE OF SHIPMENT AS PER OFFICIAL CERTIFICATE OF INSPECTION. |
| WEIGHT: | FINAL AS PER OFFICIAL WEIGHT CERTIFICATE |
| SHIPMENT: | March 1–20 1975 |
| PRICE: | U.S. DLS 166.—PER METRIC TON FOB UNSTOWED AND UNTRIMMED ONE SAFE U.S. GULF PORT |
| PAYMENT: | CASH AGAINST DOCUMENTS ITALY BY WIRE TRANSFER U.S.A. |
| GOVERNING TERMS: | NEWEST NAEGA 2 |

Exhs. 2 & 3.

On Saturday morning, October 5, Dal Ferro telexed back to Marchetti:

---

4. All exhibits referred to are petitioner Beromun's unless otherwise indicated.

5. All telexes referred to are English translations of the Italian originals.

GOOD MORNING

CONTRACT DATED OCTOBER 4, 1974 BEROMUN AG–TRIESEN/OURSELVES LT 25,000 US 3 YELLOW CORN F.O.B. GULF

SHIPMENT MARCH1–20, 1975

WITH REFERENCE TO YOUR TELEX CONFIRMATION OF THE TRANSACTION AT 1913 PLEASE NOTE THAT AT THE TIME OF THE CONCLUSION OF THE TRANSACTION WHAT WAS AGREED UPON WAS "QUANTITY" NOT THE TERM "ONE VESSEL." THESE ARE THE USUAL TERMS FROM WHICH WE CANNOT DEPART. PLEASE INFORM SELLERS ABOUT IT.

SIAT DAL FERRO

Exh. 5.

Marchetti first saw the above telex from SIAT on Monday morning, October 7. On that same day, without contacting Beromun or SIPA, he spoke with Dal Ferro by telephone in Verona, Italy and tried to persuade the latter that the term "one vessel" was "irrelevant," Exh. 13, and "not a material term." Marchetti reply affid. at 3. According to Marchetti, "the conversation ended with a promise to talk again later on just to exchange information concerning the market." Exh. 13. Marchetti, although stating nowhere that he and Dal Ferro departed with a resolution of the dispute over the "one vessel" term, apparently was "under the impression that the difference had been cleared up . . . ." *Id.* This impression, however, was clearly one sided. That afternoon SIAT sent the following telex to Marchetti:

GOOD MORNING

CONTRACT DATED 10/4/1974

BEROMUN AG TRIESEN/OURSELVES

25,000 LT US 3 Y.C. FOB GULF

SHIPMENT MARCH 1–20 1975

FOLLOWING UP ON OUR TELEX OF OCTOBER 5 10:02 A.M. WE ARE COMPELLED TO CONSIDER SUBJECT CONTRACT NULL. PLEASE TAKE NOTE OF IT INFORMING SELLERS ACCORDINGLY.

REGARDS

SIAT DAL FERRO

Exh. 6.

Upon receipt of the above telex, Marchetti wired back on the same day:

CONTRACT OF 10/4/74

25,000 LT 3 YC FOR GULF MARCH 1–20, 1974

BEROMUN/YOURSELVES

WITH REFERENCE TO YOUR TELEX DATED 10/5 10:02 AND OF TODAY 1514 WE THOUGHT THAT WE HAD CLEARED UP ANY MISUNDERSTANDING DURING THE CONVERSATION WE HAD THIS MORNING WITH YOUR ESTEEMED DR. ANTONIO AND CONSEQUENTLY WE CONSIDERED YOUR TELEX OF 10/5 AS SUPERSEDED STOP

WE INFORMED THE SELLERS ABOUT YOUR TELEX OF TODAY 1514 AND THEY REJECT IT CONFIRMING THE TRANSACTION IN ORDER MODIFYING THE TERM "QUANTITY" AS REQUESTED BY YOU.

REGARDS.

Exh. 7. Apparently Marchetti also mailed a written letter of confirmation of sale to both Beromun and Dal Ferro on or about October 8. Beromun petition, ¶ 34; Exhs. 8A & 8B. After learning what had transpired, Beromun/SIPA advised Marchetti of the following by telex:

TELEX FOR MESSRS SIAT DAL FERRO

CONTRACT DATED 10/4

25,000 LT YC FOB

MARCH 1–20 1974

BEROMUN/SIAT

WE CATEGORICALLY REJECT THE CONTENTS OF THE TELEXES SENT BY BUYERS WHICH WE RECEIVED THROUGH YOU STOP

THE TRANSACTION WAS CONCLUDED ON 10/4/74 ON THE TERMS OF OUR PURCHASE FROM MESSRS. BUNGE ON THE SAME DATE THROUGH YOU. AFTER WE HAD BEEN NOTIFIED OF THE OBJEC-

TIONS MADE BY THE BUYERS AND AGREED TO AMEND THE TERM "QUANTITY" AS PER THEIR REQUEST ONLY BECAUSE WE WERE ABLE TO AGREE TO SUCH CONDITION STOP OUR WILLINGNESS TO GRANT THESE TERMS CONSTITUTED NO GROUNDS WHATEVER FOR THE BUYERS TO CONSIDER THE TRANSACTION NULL. AT THIS STAGE AS FAR AS WE ARE CONCERNED WE CONSIDER THE TRANSACTION RATIFIED AS PER YOUR TELEX CONFIRMATION DATED 10/4, 1901 AND THE ABOVE MENTIONED AMENDMENT. PLEASE INVITE OUR COUNTER PARTY TO COMPLY WITH THEIR CONTRACTUAL OBLIGATION UNDERTAKEN THROUGH YOU.

REGARDS.

BEROMUN A.G.

Exh. 9. SIAT telexed back to Marchetti that it rejected entirely the above message and referred him to SIAT's own telexes of October 5 and 7. Exh. 11. SIAT also rejected, on October 18, the Marchetti letter of confirmation that had been mailed on October 8. Thereafter Marchetti wrote to Dal Ferro of SIAT on October 23, advising him, *inter alia*, that Beromun would commence arbitration against SIAT at the American Arbitration Association.

On November 15 SIAT responded to Marchetti's October 23 letter. SIAT emphasized that on October 7 when Marchetti spoke with Dal Ferro in Verona, Dal Ferro had "asked whether the seller would withdraw the term 'one vessel' which had not been agreed upon, and that the clear answer was no." Exh. 14. Marchetti responded, contending that the "one vessel" term had been orally agreed upon and that Dal Ferro had presented no ultimatum during the telephone conversation in Verona on the morning of October 7.

In the interim, Beromun received the letter of confirmation mailed by Marchetti around October 8. Beromun then prepared, through SIPA, its own written confirmation of sale, without the one vessel term, and mailed it to Dal Ferro. Exh. 16. It was returned to SIPA, unconfirmed by Dal Ferro, around November 26.

Communications among Beromun/SIPA, Marchetti, and SIAT/Dal Ferro apparently continued, and on January 31, 1975 Beromun telexed SIAT that the former had learned from Marchetti that SIAT wished to submit the entire dispute to arbitration. Beromun also urged SIAT to assure Beromun that SIAT would complete its purchase. Exh. 17. Having received no reply to this telex, Beromun sent a similar telex on February 3 urging SIAT to "PERFORM YOUR ABOVE MENTIONED PURCHASE FROM US." Exh. 18. A third telex of the same tenor following on February 5 from Beromun. Exh. 19. SIAT finally telexed Beromun on February 6 that those three telexes were not pertinent to and did not concern SIAT. Exh. 20. SIAT sent the same telegram to Marchetti, but also included a postscript that did not appear on the telex sent to Beromun. The postscript stated "HOWEVER WE ARE AGREEABLE TO ARBITRATION ON THE PROVISIONS OF THE MENTIONED DOCUMENT." Exh. 21.

When Marchetti received SIAT's telegram indicating that SIAT was amenable to arbitration, he forwarded it to Beromun. Beromun thereupon telexed SIAT that Beromun also wished to arbitrate and requested a clarification of SIAT's intentions with regard to the alleged contract. Exh. 22. SIAT responded that it did not understand Beromun's questions and referred the latter to the telex of October 7 to Marchetti wherein SIAT had stated that it was compelled to consider the contract a nullity. Exh. 23. Apparently Beromun responded, because three days later SIAT sent another telex to Beromun, through the latter's agent SIPA. This telex emphatically stated that SIAT had never entered into a contract with Beromun because SIAT had never agreed to the "one vessel" term that Marchetti inserted in his confirmation telex. SIAT further stated that it had had no discussions with Marchetti after October 7 and declared that its telex to Marchetti that

made reference to arbitration was not an agreement to arbitrate. Two final paragraphs were included. They stated:

4) ALTHOUGH WE DO NOT HAVE A CONTRACT TO ARBITRATE, WE ARE WILLING TO SUBMIT THIS DISPUTE TO THE AMERICAN ARBITRATION ASSOCIATION PURSUANT TO ITS GRAIN ARBITRATION RULES. OUR AGREEMENT TO DO SO, HOWEVER, IS IN NO WAY A CONCESSION THAT WE ARE ACTUALLY REQUIRED TO SUBMIT THE DISPUTE TO ARBITRATION. IF YOU AGREE TO HAVE THIS MATTER SUBMITTED TO ARBITRATION AS ABOVE, PLEASE HAVE YOUR ATTORNEY, CONTACT OUR ATTORNEY DAVID A. BOTWINIK, PAVIA AND HARCOURT, 63 WALL STREET, NEW YORK, N. Y. 10005. 5) OUR AGREEMENT TO ARBITRATE THE DISPUTE AS PER PARAGRAPH 4) HEREINABOVE IS SUBJECT TO YOUR PAYMENT WITHIN TEN DAYS OF WHAT YOU OWE US FOR PREVIOUS CONTRACTS WHICH YOU ARE UNREASONABLY WITHHOLDING. REGARDS.

SIAT DAL FERRO

Exh. 24.

Upon receipt of SIAT's latest telex, Beromun responded that it was forwarding the telex to its own attorneys, disagreed that a contract had never been entered into, disagreed that there had been no agreement to arbitrate, and agreed to remit $169,193.47 owed by Beromun to SIAT as of February 12. Exh. 25. SIAT confirmed the amount due from Beromun. Exh. 26. Beromun then telexed SIAT that Beromun's bank was forwarding the sum due, that Beromun accepted SIAT's proposal to arbitrate without prejudice to Beromun's position that it had a contract with SIAT, and that its counsel would contact SIAT's attorneys. Exh. 27. This last communication ended the parties' battle of the telexes, but it also marked the start of the battle of the letters.

Beromun's attorney wrote to SIAT's counsel on February 20, 1975, Exh. 28; on March 5 SIAT's counsel sent to Beromun's attorney a proposed draft of a submission agreement under the Grain Arbitration Rules of the American Arbitration Association, along with a caveat that it was "only a draft" and was subject to SIAT's final approval. Exh. 29. This draft submission framed the issues as follows:

Did S.I.A.T. s.a.s. on or about October 4, 1974 enter into a contract for the purchase of U.S. No. 6 Yellow Corn from Beromun A.G.? S.I.A.T. asserts that no contract was entered into. Beromun asserts that a contract was entered into and that as a result of S.I.A.T.'s breach of that contract Beromun has suffered damages in the amount of $_____.

*Id.* It also contained the following proviso:

This agreement [to arbitrate] is subject to and conditioned upon each party paying to the other all amounts owed in connection with the contracts which become due prior to the arbitration hearing. If payment is not made when due, the party who has not been paid shall have the right to cancel this agreement upon notice to the other party, and it shall no longer have any force and effect.

*Id.*

Beromun's attorney reviewed the draft submission, wrote to SIAT's counsel to inquire whether SIAT insisted upon the insertion of the above proviso, and indicated that he would await SIAT's reaction to the draft. Exh. 30. On April 15 SIAT's counsel informed Beromun's attorney that he had not yet heard from his client. Exh. 31. Once again on May 1 SIAT's counsel wrote to Beromun's attorneys, stating that Beromun owed SIAT $30,000, and that if Beromun remitted that sum then SIAT would enter into the submission to arbitration contained in Exh. 29. See Exh. 32. Apparently a dispute ensued as to the accuracy of the amount Beromun owed SIAT, see Exh. 33, and finally SIAT's attorney informed Beromun's counsel that SIAT would not agree to arbitrate because Beromun and its affiliates had been withholding money due on other matters. Exh. 34. Approximately a year and a half later Beromun served SIAT and the AAA with a demand for arbitra-

tion. See Exhs. 35 & 37. Thereafter, on November 30, 1976, SIAT's counsel wrote to the AAA to object to its arbitration of the parties' dispute. Exh. 38. The AAA then declined to go forward with an arbitration proceeding, and Beromun commenced this suit in July of 1978, approximately one year and eight months after SIAT objected to any AAA proceeding.

## DISCUSSION

As noted above, Beromun's first theory is that the parties incorporated by reference an arbitration clause into a sales contract. Specifically, the agreement to arbitrate, Beromun claims, was incorporated by the reference to "NEWEST NAEGA N.2" during the October 4, 1974 conversation between Marchetti and Dal Ferro, and subsequently within Marchetti's telexes, Exhs. 2 & 3, to Beromun and SIAT.

"NEWEST NAEGA N.2" is an abbreviation for newest North American Export Grain Association (NAEGA) form Number 2. The NAEGA form contains various conditions, rules, and price, payment, delivery, weight and quality terms. It also contains a standard arbitration clause that includes a consent to personal jurisdiction of all the courts of New York State. It provides:

3. ARBITRATION. Buyer and seller agree that any controversy or claim arising out of, in connection with or relating to this contract, or the interpretation, performance or breach thereof, shall be settled by arbitration in the City of New York before the American Arbitration Association or its successors, pursuant to the Grain Arbitration Rules of the American Arbitration Association, as the same may be in effect at the time of such arbitration proceeding, which rules are hereby deemed incorporated herein and made a part hereof, and under the laws of the State of New York. The arbitration award shall be final and binding on both parties and judgment upon such arbitration award may be entered in the Supreme Court of the State of New York or any other Court having Jurisdiction thereof. *Buyer and seller hereby recog-*

*nize and expressly consent to the jurisdiction over each of them of the American Arbitration Association or its successors, and of all the Courts in the State of New York.* Buyer and seller agree that this contract shall be deemed to have been made in New York State and be deemed to be performed there, any reference herein or elsewhere to the contrary notwithstanding.

Exh. 1 (emphasis added). It appears that the only basis for personal jurisdiction over SIAT is the submission to jurisdiction clause underscored above. Thus, this court must find an enforceable agreement to arbitrate not only as a basis of subject matter jurisdiction, as noted above, but also as a predicate for the exercise of *in personam* jurisdiction over SIAT. *See Avila Group, Inc. v. Norma J. of California,* 426 F.Supp. 537, 541 & n.13 (S.D.N.Y.1977) (Weinfeld, J.).

Since jurisdiction is alleged under Chapter 2 of the Federal Arbitration Act, 9 U.S.C. § 201 *et seq.,* the issue of the enforceability and validity of the parties' arbitration clause is governed by federal law. *Ferrara S.p.A. v. United Grain Growers, Ltd.,* 441 F.Supp. 778, 780 & n.2 (S.D.N.Y. 1977), *aff'd without opinion,* 580 F.2d 1044 (2d Cir. 1978). This is the applicable rule in actions arising under Chapter 1 of the Arbitration Act, *Prima Paint Corp. v. Flood & Conklin Manufacturing Co.,* 388 U.S. 395, 404–06, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967); *Robert Lawrence Co. v. Devonshire Fabrics, Inc.,* 364 U.S. 801, 81 S.Ct. 27, 5 L.Ed.2d 37 (1960); *Avila Group, Inc. v. Norma J. of California,* 426 F.Supp. at 540, where "federal law applies to all questions of interpretation, construction, validity, revocability and enforceability [of an arbitration agreement]." *Coenen v. R.W. Pressprich & Co.,* 453 F.2d 1209, 1211 (2d Cir.), *cert. denied,* 406 U.S. 949, 92 S.Ct. 2045, 32 L.Ed.2d 337 (1972). This applicable body of federal law consists of "generally accepted principles of contract law," *Ferrara S.p.A. v. United Grain Growers, Ltd.,* 441 F.Supp. at 780; *see also Fisser v. International Bank,* 282 F.2d 231, 233 (2d Cir. 1960); *Avi-*

la Group, Inc. v. Norma J. of California, 426 F.Supp. at 540; *Joseph Muller Corp. Zurich v. Commonwealth Petrochemicals, Inc.,* 334 F.Supp. 1013, 1018 (S.D.N.Y.1971),[6] and the Uniform Commercial Code ("U.C.C.") is appropriately considered a part thereof since it has been enacted among a majority of the states. *Lea Tai Textile Co. v. Manning Fabrics, Inc.,* 411 F.Supp. 1404, 1405 (S.D.N.Y.1975), *quoting In re Yale Express Systems, Inc.,* 370 F.2d 433, 437 (2d Cir. 1966).

 It has been stated that "[a] written agreement for arbitration is the *sine qua non* of an enforceable arbitration agreement," *Garnac Grain Co. v. Nimpex International, Inc.,* 249 F.Supp. 986, 986 (S.D.N.Y.1964), and such a writing is required under the Convention. Article II, § 1. *See also* 9 U.S.C. § 202 incorporating 9 U.S.C. § 2 which requires a writing. It need not be signed, however, and ordinary contract principles dictate when the parties are bound by a written arbitration provision absent their signatures. *Fisser v. International Bank,* 282 F.2d at 233; *Interocean Shipping Co. v. National Shipping and Trading Corp.,* 523 F.2d 527, 539 (2d Cir. 1975), *cert. denied,* 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643 (1976); *Fox v. Merrill Lynch & Co.,* 453 F.Supp. 561, 564 (S.D.N.Y. 1978).

 With the above in mind I now turn to the NAEGA arbitration provision claimed to have been incorporated into Marchetti's October 4 telexes to Beromun and SIAT, Exhs. 2 & 3, and to which it is contended SIAT became contractually bound.

Beromun's theory of contract is founded upon U.C.C. § 2–207 (McKinney 1964) which provides in pertinent part:

Additional Terms in Acceptance or Confirmation.

(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

(a) the offer expressly limits acceptance to the terms of the offer;

(b) they materially alter it; or

(c) notification or objection to them has already been given or is given within a reasonable time after notice of them is received.

Beromun contends that an oral contract was concluded on October 4, 1974 when Marchetti spoke to Dal Ferro; that Marchetti's identical telexes sent to Beromun and Dal Ferro on that day were written confirmations under section 2–207(1) executed for the parties as seller and buyer; that the disputed "one vessel" term may be treated as an additional or different term;[7] that as such the "one vessel" term was a proposal for addition to the contract under

---

**6.** *But see Duplan Corp. v. W.B. Davis Hosiery Mills, Inc.,* 442 F.Supp. 86, 87–88 (S.D.N.Y. 1977) (Lasker, J.). There the court stated that although the scope of an arbitration agreement is determined under federal law, the existence and validity of such an agreement is governed by state law contract principles. Thus conflicts of law rules of the forum state were applied in deciding which state's law was determinative on the issue of whether there was a valid agreement to arbitrate between the parties. The same approach was also followed by Judge Lasker in *Farkar Co. v. R.A. Hanson Disc, Ltd.,* 441 F.Supp. 841, 845 (S.D.N.Y.1977), *aff'd as modified,* 583 F.2d 68 (2d Cir. 1978). On this

issue Professor Leflar has suggested that, regardless of whether the litigation is in state or federal court, state law governs the treatment of arbitration agreements that do not fall under the Federal Arbitration Act while the Act establishes a federal substantive rule of the validity of agreements to arbitrate in interstate commerce and maritime contracts. R. Leflar, *American Conflicts Law* § 155, at 320 (3d ed. 1977).

**7.** In arguing this position Beromun does not, however, abandon its contention that the "one vessel" term was indeed assented to orally by Dal Ferro for SIAT.

section 2–207(2);[8] and that SIAT's October 5 telex, Exh. 5, stating that "one vessel" had not been agreed upon, was a "notification of objection" to the "one vessel" term that resulted in its exclusion from an already consummated contract.

In support of the above theory Beromun relies heavily on the wording used by SIAT in its October 5 telex. Exh. 5. Specifically, Beromun points to SIAT's use of the words "contract dated October 4, 1974," and "what was agreed upon," the reference to the "conclusion of the transaction," and the failure to object to the broker's sending of a confirmation. Beromun memorandum at 9. To further enhance its argument that a contract had been formed and that SIAT was attempting to renege, Beromun cites a newspaper article, Exh. 4, wherein it is reported that former President Gerald Ford issued a "hold order" on two contracts for the sale of 125 million bushels of corn and wheat to the Soviet Union on the evening of October 4, 1974. This is incorporated into the petition apparently to show that as a result of the President's action grain dealers had reason to become apprehensive that additional export controls would be imposed, the market price of American grain became speculative, and SIAT had a motive to withdraw from the deal.

In the absence of more convincing proof that Marchetti and Dal Ferro for SIAT in fact concluded an oral contract on the afternoon of October 4, 1974, I find Beromun's arguments and its proffered application of U.C.C. § 2–207 to the instant set of facts to be specious for the following reasons.

Both Beromun and SIAT have had extensive business dealings in the international corn and grain trade with each other and third parties. Beromun contends that when parties negotiate a transaction through a broker, it is customary that both the buyer and the seller consider themselves contractually bound from the time the broker confirms the transaction by telephone. Beromun petition, ¶ 16. Even assuming *arguendo* that this is the customary means of negotiating a contract of sale in the grain trade, I have determined that no meeting of the minds occurred during Marchetti and Dal Ferro's conversation of October 4. The evidence shows, according to Marchetti, that the terms of the proposed sale, including "NAEGA 2" and "one vessel," were read to Dal Ferro. Again according to Marchetti, Dal Ferro expressed agreement to those terms through the words "make it." Marchetti affid. & reply affid. In contrast, Dal Ferro contends that no deal was ever finalized due to Marchetti's unilateral insistence, subsequent to the oral conversation, on the "one vessel" term—a term obviously considered important by SIAT and one to which SIAT has steadfastly denied ever having orally agreed. Dal Ferro affid.; Exh. 5. Faced with this contradictory evidence, I conclude that no oral agreement has been established, Marchetti's impressions and beliefs to the contrary notwithstanding.

There being no prior oral agreement, Marchetti's October 4 confirmation telexes, Exhs. 2 & 3, were not a true confirmation but rather an offer. *See generally* Official Comment 1 to U.C.C. § 2–207. I find this to be so despite SIAT's language in Exh. 5 cited by Beromun to persuade the court that SIAT considered itself contractually bound even before Marchetti forwarded Exh. 3 to SIAT. Further, SIAT's response to Marchetti in Exh. 5 was not "[a] definite and seasonable expression of acceptance," U.C.C. § 2–207(1), but rather an acceptance "expressly made conditional on [Beromun's] assent," *id.*, to SIAT's deviation from the "one vessel" term, or a counteroffer. The telex clearly stated

WHAT WAS AGREED UPON WAS "QUANTITY" NOT THE TERM "ONE VESSEL." THESE ARE THE USUAL

---

8. Official Comment 3 to U.C.C. § 2–207 accords the same treatment to "different" and "additional" terms for purposes of subsection 2–207(2). *See also Ebasco Services Inc. v. Pennsylvania Power & Light Co.*, 402 F.Supp. 421, 440 & n.27 (E.D.Pa.1975). *But see* J. Calamari & J. Perillo, *The Law of Contracts* § 2–22, at 70 n.64 (2d ed. 1977) where it is stated that " '[d]ifferent' terms, apparently those which contradict the offer, never form part of the contract unless accepted by the offeror." (Citations omitted).

TERMS FROM WHICH WE CANNOT DEPART. PLEASE INFORM SELLERS ABOUT IT.

Exh. 5. Before Beromun assented to the above through Marchetti, see Exh. 7, SIAT withdrew from the negotiations when it telexed to Marchetti that it was compelled to consider the "subject contract null" after unsuccessfully attempting to work out the "one vessel" term that morning in Verona. Exh. 6. Consequently, no contract was ever entered into between the parties.

Because no contract existed, SIAT never became contractually bound to arbitrate through Marchetti's written arbitration and consent-to-jurisdiction clause incorporated by reference to NAEGA 2 in Exhs. 2 & 3. Moreover, in light of my holding that no contract was formed, SIAT's subsequent written offers to arbitrate are of no moment since no subject matter existed for arbitration.

In conclusion, since there was no agreement to arbitrate, Beromun's application for an order directing arbitration is denied. The petition is dismissed for lack of subject matter and *in personam* jurisdiction, and the balance of SIAT's arguments need not be reached.

SO ORDERED.