FILANTO, S.p.A., Plaintiff,

v.

CHILEWICH INTERNATIONAL CORP., Defendant.

No. 91 CIV 3253 (CLB).

United States District Court,
S.D. New York.

April 14, 1992.

Judith Passannante, Becker, Glynn, Melamed & Muffly, New York City, for plaintiff.

Robert Fryd, Warshaw, Burstein, Cohen, Schlesinger & Kuh, New York City, for defendant.

## MEMORANDUM & ORDER

BRIEANT, Chief Judge.

By motion fully submitted on December 11, 1991, defendant Chilewich International Corp. moves to stay this action pending arbitration in Moscow. Plaintiff Filanto has moved to enjoin arbitration or to order arbitration in this federal district.

This case is a striking example of how a lawsuit involving a relatively straightforward international commercial transaction can raise an array of complex questions. Accordingly, the Court will recount the factual background of the case, derived from both parties' memoranda of law and supporting affidavits, in some detail.

Plaintiff Filanto is an Italian corporation engaged in the manufacture and sale of footwear. Defendant Chilewich is an export-import firm incorporated in the state of New York with its principal place of business in White Plains. On February 28, 1989, Chilewich's agent in the United Kingdom, Byerly Johnson, Ltd., signed a contract with Raznoexport, the Soviet[1] Foreign Economic Association, which obligated Byerly Johnson to supply footwear to Raznoexport. Section 10 of this contract—the "Russian Contract"—is an arbitration clause, which reads in pertinent part as follows:

---

1. The Court will use the adjective "Russian" when describing Raznoexport's role in this transaction, since all relevant events occurred in what is now the Republic of Russia.

"All disputes or differences which may arise out of or in connection with the present Contract are to be settled, jurisdiction of ordinary courts being excluded, by the Arbitration at the USSR Chamber of Commerce and Industry, Moscow, in accordance with the Regulations of the said Arbitration."[sic]

Ex. C to July 19 Simon Chilewich Affidavit. This contract was signed by Byerly Johnson and by Raznoexport, and is sometimes referred to as "Contract No. 32–03/93085".

The first exchange of correspondence between the parties to this lawsuit is a letter dated July 27, 1989 from Mr. Melvin Chilewich of Chilewich International to Mr. Antonio Filograna, chief executive officer of Filanto. This letter refers to a recent visit by Chilewich and Byerly Johnson personnel to Filanto's factories in Italy, presumably to negotiate a purchase to fulfill the Russian Contract, and then states as follows:

"Attached please find our contract to cover our purchase from you. Same is governed by the conditions which are enumerated in the standard contract in effect with the Soviet buyers [the Russian contract], copy of which is also enclosed."

Ex. A to September 16 Melvin Chilewich Affidavit. The next item in the record is a letter from Filanto to Chilewich dated September 2, 1989. Ex. D to October 29 Filograna Affidavit. This letter refers to a letter from Chilewich to Filanto of August 11, 1989, which "you [Chilewich] sent me with the contracts n 10001–10002–10003." These numbers do not correspond to the contract sued on here, but refer instead to other, similar contracts between the parties.[2] None of these contracts, or their terms, are in the record, both parties having been afforded ample opportunity to submit whatever they wished.

The last paragraph of the September 2, 1989 letter from Filanto to Chilewich states as follows:

"Returning back the enclosed contracts n 10001–10002–10003 signed for acceptance, we communicate, if we do not mis-

understood, the Soviet's contract that you sent us together with your above mentioned contract, that of this contract we have to respect only the following points of it:

–n 5 Packing and marking

–n 6 Way of Shipment

–n 7 Delivery—Acceptance of Goods

We ask for your acceptance by return of post." [SIC]

Ex. D to October 29 Filograna Affidavit. The intent of this paragraph, clearly, was to exclude from incorporation by reference *inter alia* section 10 of the Russian contract, which provides for arbitration. Chilewich, for its part, claims never to have received this September 2 letter. In any event, it relates only to prior course of conduct.

It is apparent from the record that further negotiations occurred in early 1990, but the content of those negotiations is unclear; it is, however, clear that deliveries of boots from Filanto to Chilewich were occurring at this time, pursuant to other contracts, since there is a reference to a shipment occurring between April 23, 1990 and June 11, 1990. Ex. H to December 4 Simon Chilewich Affidavit.

The next document in this case, and the focal point of the parties' dispute regarding whether an arbitration agreement exists, is a Memorandum Agreement dated March 13, 1990. This Memorandum Agreement, number 9003002, is a standard merchant's memo prepared by Chilewich for signature by both parties confirming that Filanto will deliver 100,000 pairs of boots to Chilewich at the Italian/Yugoslav border on September 15, 1990, with the balance of 150,000 pairs to be delivered on November 1, 1990. Chilewich's obligations were to open a Letter of Credit in Filanto's favor prior to the September 15 delivery, and another letter prior to the November delivery. This Memorandum includes the following provision:

"It is understood between Buyer and Seller that USSR Contract No. 32–03/93085 [the Russian Contract] is hereby

---

**2.** In his affidavit dated October 29, 1991, Mr. Filograna states that there were actually six contracts between the parties. October 29 Filograna Affidavit at ¶ 5.

incorporated in this contract as far as practicable, and specifically that any arbitration shall be in accordance with that Contract."

Ex. A to July 24 Simon Chilewich Affidavit. Chilewich signed this Memorandum Agreement, and sent it to Filanto. Filanto at that time did not sign or return the document. Nevertheless, on May 7, 1990, Chilewich opened a Letter of Credit in Filanto's favor in the sum of $2,595,600.00. The Letter of Credit itself mentions the Russian Contract, but only insofar as concerns packing and labelling. Ex. A to December 4 Simon Chilewich Affidavit.

Again, on July 23, 1990, Filanto sent another letter to Chilewich, Ex. D to October 23 Filograna Affidavit, which reads in relevant part as follows:

"We refer to Point 3, Special Conditions, to point out that: returning back the above-mentioned contract, signed for acceptance, from Soviet Contract 32-03/93085 we have to respect only the following points of it:

–No. 5—Packing and Marking

–No. 6—Way of Shipment

–No. 7—Delivery—Acceptance of Goods".

It should be noted that the contract referred to in this letter is apparently another contract between the parties, as the letter refers to "Sub. Contract No. 32-03/03122", while the contract sued on in the present action is No. 32-03/03123.

This letter caused some concern on the part of Chilewich and its agents: a July 30, 1990 fax from Byerly Johnson, Chilewich's agent, to Chilewich, mentions Filanto's July 23 letter, asserts that it "very neatly dodges" certain issues, other than arbitration, covered by the Russian Contract, and states that Johnson would "take it up" with Filanto during a visit to Filanto's offices the next week. Ex. G to December 4 Simon Chilewich Affidavit.

Then, on August 7, 1990, Filanto returned the Memorandum Agreement, sued on here, that Chilewich had signed and sent to it in March; though Filanto had signed the Memorandum Agreement, it once again appended a covering letter, purporting to exclude all but three sections of the Russian Contract. Ex. A to December 11 Filograna Affidavit.

There is also in the record an August 7, 1990 telex from Chilewich to Byerly Johnson, stating that Chilewich would not open the second Letter of Credit unless it received from Filanto a signed copy of the contract without any exclusions. Ex. C to December 4 Simon Chilewich Affidavit. In order to resolve this issue, Byerly Johnson on August 29, 1990 sent a fax to Italian Trading SRL, an intermediary, reading in relevant part:

"We have checked back through our records for last year, and can find no exclusions by Filanto from the Soviet Master Contract and, in the event, we do not believe that this has caused any difficulties between us.

We would, therefore, ask you to amend your letters of the 23rd July 1990 and the 7th August 1990, so that you accept all points of the Soviet Master Contract No. 32-03/93085 as far as practicable. You will note that this is specified in our Special Condition No. 3 of our contracts Nos. 9003001 and 9003[illegible]".

Ex. D to December 4 Simon Chilewich Affidavit. Filanto later confirmed to Italian Trading that it received this fax. Ex. G to December 4 Simon Chilewich Affidavit.

As the date specified in the Memorandum Agreement for delivery of the first shipment of boots—September 15, 1990—was approaching, the parties evidently decided to make further efforts to resolve this issue: what actually happened, though, is a matter of some dispute. Mr. Filograna, the CEO of Filanto, asserts that the following occurred:

"Moreover, when I was in Moscow from September 2 through September 5, 1990, to inspect Soviet factories on an unrelated business matter, I met with Simon Chilewich. Simon Chilewich, then and there, abandoned his request of August 29, 1990, and agreed with me that the Filanto–Chilewich Contract would incorporate only the packing, shipment and delivery terms of the Anglo–Soviet Contract. Also present at this meeting were

Sergio Squilloni of Italian Trading (Chilewich's agent), Kathy Farley, and Max Flaxman of Chilewich and Antonio Sergio of Filanto."

December 11 Filograna Affidavit at ¶ 5.

Mr. Simon Chilewich, in *his* sworn affidavit, does not refer to this incident, but does state the following:

"In fact, subsequent to the communications and correspondence described above, I met with Mr. Filograna face to face in Paris during the weekend of September 14, 1990. During that meeting, I expressly stated to him that we would have no deal if Filanto now insisted on deleting provisions of the Russian Contract from our agreement. Mr. Filograna, on behalf of Filanto, stated that he would accede to our position, in order to keep Chilewich's business."

December 4 Simon Chilewich Affidavit at ¶ 25. Plaintiff does not address or deny defendant's version of the Paris meeting. Filanto's Complaint in this action alleges that it delivered the first shipment of boots on September 15, and drew down on the Letter of Credit. Complaint at ¶ 8.

On September 27, 1990, Mr. Filograna faxed a letter to Chilewich. This letter refers to "assurances during our meeting in Paris", and complains that Chilewich had not yet opened the second Letter of Credit for the second delivery, which it had supposedly promised to do by September 25. Ex. B to December 4 Simon Chilewich Affidavit. Mr. Chilewich responded by fax on the same day; his fax states that he is "totally cognizant of the contractual obligations which exist", but goes on to say that Chilewich had encountered difficulties with the Russian buyers, that Chilewich needed to "reduce the rate of shipments", and denies that Chilewich promised to open the Letter of Credit by September 25. Ex. C to December 11 Filograna Affidavit.

According to the Complaint, what ultimately happened was that Chilewich bought and paid for 60,000 pairs of boots in January 1991, but never purchased the 90,000 pairs of boots that comprise the balance of Chilewich's original order. Complaint at ¶¶ 9–11. It is Chilewich's failure to do so that forms the basis of this lawsuit, commenced by Filanto on May 14, 1991.

There is in the record, however, one document that post-dates the filing of the Complaint: a letter from Filanto to Chilewich dated June 21, 1991. This letter is in response to claims by Byerly Johnson that some of the boots that *had* been supplied by Filanto were defective. The letter expressly relies on a section of the Russian contract which Filanto had earlier purported to exclude—Section 9 regarding claims procedures—and states that "The April Shipment and the September Shipment are governed by the Master Purchase Contract of February 28, 1989, n 32–03/93085 (the "Master Purchase Contract")." Ex. H to December 4 Simon Chilewich Affidavit.

This letter must be regarded as an admission in law by Filanto, the party to be charged. A litigant may not blow hot and cold in a lawsuit. The letter of June 21, 1991 clearly shows that when Filanto thought it desirable to do so, it recognized that it was bound by the incorporation by reference of portions of the Russian Contract, which, prior to the Paris meeting, it had purported to exclude. This letter shows that Filanto regarded itself as the beneficiary of the claims adjustment provisions of the Russian Contract. This legal position is entirely inconsistent with the position which Filanto had professed prior to the Paris meeting, and is inconsistent with its present position. Consistent with the position of the defendant in this action, Filanto admits that the other relevant clauses of the Russian Contract were incorporated by agreement of the parties, and made a part of the bargain. Of necessity, this must include the agreement to arbitrate in Moscow. In the June 21, 1991 letter, Mr. Filograna writes:

"The April Shipment and the September Shipment are governed by the Master Purchase Contract of February 28, 1989 N. 32–03–93085 (the "Master Purchase Contract") The Master Purchase Contract provides that claims for inferior quality must be made within six months

of the arrival of the goods at the USSR port".

Ex. H to December 4 Simon Chilewich Affidavit.

Against this background based almost entirely on documents, defendant Chilewich on July 24, 1991 moved to stay this action pending arbitration, while plaintiff Filanto on August 22, 1992 moved to enjoin arbitration, or, alternatively, for an order directing that arbitration be held in the Southern District of New York rather than Moscow, because of unsettled political conditions in Russia.

### Jurisdiction/Applicable Law

Plaintiff bases subject matter jurisdiction in this action on diversity of citizenship, as Filanto is an Italian corporation with its principal place of business in Italy, while Chilewich is a New York corporation with its principal place of business in New York, thereby invoking New York law and choice of law rules, under *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

██ This Court, however, finds another overriding basis for subject matter jurisdiction which will affect our choice of law: chapter 2 of the Federal Arbitration Act, which comprises the Convention on the Recognition and Enforcement of Foreign Arbitral Awards and its implementing legislation, *codified at* 9 U.S.C. § 201 *et seq.* (West Supp.1991). The United States, Italy and the USSR are all signatories to this Convention, and its implementing legislation makes clear that the Arbitration Convention governs disputes regarding arbitration agreements between parties to international commercial transactions:

"An arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title, falls under the Convention. An agreement or award arising out of such a relationship which

is entirely between citizens of the United States should be deemed not to fall under the Convention ..." 9 U.S.C. § 202 (West Supp.1991).

The Arbitration Convention specifically requires courts to recognize any "agreement in writing under which the parties undertake to submit to arbitration...." Convention on the Recognition and Enforcement of Foreign Arbitral Awards Article II(1). The term "agreement in writing" is defined as "an arbitral clause in a contract or an arbitration agreement, signed by the parties or contained in an exchange of letters or telegrams". Convention on the Recognition and Enforcement Of Foreign Arbitral Awards Article II(2).

The Convention's implementing legislation also provides an independent basis of subject matter jurisdiction:

"An action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States. The district courts of the United States ... shall have original jurisdiction over such an action or proceeding, regardless of the amount in controversy." 9 U.S.C. § 203 (West Supp.1991).

Thus, although defendant has moved for a stay under Chapter 1 of the Arbitration Act, 9 U.S.C. § 3 (West 1970), this case actually falls under Chapter 2 of that title—the Convention and its implementing legislation.[3]

██ This independent jurisdictional basis is of some importance to this litigation. On a motion pursuant to the Arbitration Act, federal law governs issues relating to the arbitrability of a dispute. *Moses H. Cone Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983) (Act "creates a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act"); *Prima Paint v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404–05, 87 S.Ct. 1801, 1806–07, 18 L.Ed.2d 1270 (1967) (application of federal arbitra-

---

**3.** The interesting question of remedy thus presented—whether a stay is available in a Con-

vention case—is discussed *infra* at 1241–42.

tion law in diversity case permissible notwithstanding *Erie* since Arbitration Act was enacted pursuant to Congressional commerce power); *McPheeters v. McGinn, Smith & Co.,* 953 F.2d 771, 772 (2d Cir. 1992) ("Federal law ... governs the current dispute as to the scope of the agreement") (citation omitted); *Genesco, Inc. v. T. Kakiuchi & Co., Ltd.,* 815 F.2d 840, 845 (2d Cir.1987) (same); *Coenen v. R.W. Pressprich & Co.,* 453 F.2d 1209, 1211 (2d Cir.) ("Once a dispute is covered by the Act, federal law applies to all questions of interpretation, construction, validity, revocability and enforceability"), *cert. denied,* 406 U.S. 949, 92 S.Ct. 2045, 32 L.Ed.2d 337 (1972).

█ However, the focus of this dispute, apparent from the parties' submissions, is not on the *scope* of the arbitration provision included in the Russian contract; rather, the threshold question is whether these parties actually agreed to arbitrate their disputes at all. In such a situation, where the issue is whether there is any arbitration agreement between the parties, there is authority for the proposition that state, rather than federal law, should be applied. *Recold, S.A. de C.V. v. Monfort of Colorado, Inc.,* 893 F.2d 195, 197 n. 6 (8th Cir. 1990) ("In addressing the issue of whether a party has entered into an agreement to arbitrate under the Arbitration Act, courts are to apply general state law principles....") (citation omitted); *Supak & Sons Mfg. Co., Inc. v. Pervel Industries, Inc.,* 593 F.2d 135, 137 (4th Cir.1979) ("Section 2 [of the Act] dictates the effect of a contractually-agreed upon arbitration provision, but it does not displace state law on the general principles governing formation of the contract itself"); *Astor Chocolate Corp. v. Mikroverk, Ltd.,* 704 F.Supp. 30, 33 (E.D.N.Y.1989) ("While federal law governs the issue of the scope of the arbitration clause, state law governs the issue of whether or not the clause is part of the contract"); *Cook Chocolate Co. v. Salomon, Inc.,* 684 F.Supp. 1177, 1182 (S.D.N.Y.1988) ("At the same time, however, § 2 of the Act preserves general principles of state contract law as rules of decision on whether the parties have en-

tered into an agreement to arbitrate"); *Duplan Corp. v. W.B. Davis Hosiery Mills, Inc.,* 442 F.Supp. 86, 87–88 (S.D.N.Y.1977) (Congress in passing Arbitration Act did not intend "to create a federal law of contract formation"). Indeed, the Supreme Court has recently indicated that this analysis is correct, at least with respect to cases controlled by chapter 1 of the Arbitration Act:

> "Thus, state law, whether of legislative or judicial origin, is applicable *if* that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally".

*Perry v. Thomas,* 482 U.S. 483, 492 n. 9, 107 S.Ct. 2520, 2527, 96 L.Ed.2d 426 (1987) (emphasis in original). *See also Volt Information Sciences v. Leland Stanford, Jr. University,* 489 U.S. 468, 475, 109 S.Ct. 1248, 1253–54, 103 L.Ed.2d 488 (1989) (same).

Plaintiff at one point did contend that state law applied, for an understandable reason: New York law arguably imposes a heavier burden on a party seeking to compel arbitration than does its federal counterpart. *Compare Schubtex, Inc., v. Allen Snyder, Inc.,* 49 N.Y.2d 1, 399 N.E.2d 1154, 424 N.Y.S.2d 133 (1979) (retention without objection by buyer of seller's printed forms containing arbitration clause insufficient basis to compel buyer to arbitrate) and *Matter of Marlene Industries Corp.,* 45 N.Y.2d 327, 333, 380 N.E.2d 239, 242, 408 N.Y.S.2d 410, 413 (1978) (parties "will not be held to have chosen arbitration as the forum for the resolution of their disputes in the absence of an express, unequivocal agreement to that effect") *with Pervel Industries, Inc. v. TM Wallcovering Inc.,* 675 F.Supp. 867, 869–70 (S.D.N.Y.1987) (agreement to arbitrate may be inferred from parties' course of dealing), *aff'd,* 871 F.2d 7 (2d Cir.1989). There is, however, some authority in this Circuit that federal law applies to contract formation issues when the existence of an agreement to arbitrate is in issue. *David L. Threlkeld & Co., Inc., v. Metallgesellschaft Ltd.,* 923 F.2d 245, 249 (2d Cir.) (applying federal law of contracts to dispute regarding existence of agree-

ment to arbitrate), *cert. dismissed,* —— U.S. ——, 112 S.Ct. 17, 115 L.Ed.2d 1094 (1991); *Genesco, supra,* at 845 ("Hence whether Genesco is bound by the arbitration clause of the sales confirmation forms is determined under federal law, which comprises generally accepted principles of contract law") (footnote omitted); *Fisser v. International Bank,* 282 F.2d 231, 233 (2d Cir. 1960) (same); *In re Midland Bright Drawn Steel Ltd.,* 1989 WL 125788, 1989 U.S. Dist. Lexis 12368 (S.D.N.Y.1989) (applying federal law to contract formation issue in case governed by Arbitration Convention). *See also Matter of Ferrara, S.p.A.,* 441 F.Supp. 778, 780–81 (S.D.N.Y. 1977), *aff'd without opinion,* 580 F.2d 1044 (2d Cir.1978). *Cf. Fahnestock & Co., Inc. v. Waltman,* 935 F.2d 512, 517–19 (2d Cir.) (upholding under state law *vacatur* of punitive damages element of arbitrator's award), *cert. denied,* —— U.S. ——, 112 S.Ct. 380, 116 L.Ed.2d 331 (1991).

■ This Court concludes that the question of whether these parties agreed to arbitrate their disputes is governed by the Arbitration Convention and its implementing legislation. That Convention, as a treaty, is the supreme law of the land, U.S. Const. art. VI cl. 2, and controls *any* case in any American court falling within its sphere of application. Thus, any dispute involving international commercial arbitration which meets the Convention's jurisdictional requirements, whether brought in state or federal court, must be resolved with reference to that instrument. *See Black & Pola v. The Manes Organization, Inc.,* 72 A.D.2d 514, 421 N.Y.S.2d 6 (1st Dep't 1979) (federal law determines whether parties have agreed to arbitrate if underlying dispute involves interstate commerce), *aff'd,* 50 N.Y.2d 821, 407 N.E.2d 1345, 430 N.Y.S.2d 49 (1980). *See also Threlkeld, supra,* at 250 (holding Convention and Arbitration Act preempt Vermont statute requiring *inter alia* that arbitration agreement be signed by both parties).[4] *But see McDermott International v.*

*Lloyds Underwriters of London,* 944 F.2d 1199, 1210–11 (5th Cir.) (noting conflicting authorities on whether state courts must apply Arbitration Act and stating that "state courts do not necessarily have to stay litigation or compel arbitration under the Convention either"), *reh'g en banc denied,* 947 F.2d 1489 (5th Cir.1991). This Court believes that the Fifth Circuit is clearly wrong on this in light of Article VI of the Constitution, not therein mentioned; the Second Circuit also apparently disagrees with that court's conclusion. *Corcoran v. Ardra Insurance Co., Ltd.,* 842 F.2d 31, 35 (2d Cir.1988).

Accordingly, the Court will apply federal law to the issue of whether an "agreement in writing" to arbitrate disputes exists between these parties.

Courts confronted by cases governed by the Arbitration Convention must conduct a limited, four-part inquiry:

"1) Is there an agreement in writing to arbitrate the subject of the dispute. Convention, Articles II(1), II(2).

2) Does the agreement provide for arbitration in the territory of a signatory country? Convention, Articles I(1), I(3); 9 U.S.C. § 206; Declaration of the United States Upon Accession, reprinted at 9 U.S.C.A. § 201, Note 43 (1990 Supp.)

3) Does the agreement arise out of a legal relationship, whether contractual or not, which is considered as commercial? Convention, Article I(3); 9 U.S.C. § 202.

4) Is a party to the contract not an American citizen, or does the commercial relationship have some reasonable relation with one or more foreign states? 9 U.S.C. § 202."

*Ledee v. Ceramiche Ragno,* 684 F.2d 184, 186–87 (1st Cir.1982); *Sedco v. Petroleos Mexicanos Mexican National Oil Co.,* 767 F.2d 1140, 1145 (5th Cir.1985); *Tennessee Imports, Inc. v. Filippi,* 745 F.Supp. 1314, 1321 (M.D.Tenn.1990); *Corcoran v. Ardra Insurance Co., Ltd.,* 657 F.Supp. 1223,

---

**4.** Another court confronted by a case in exactly the same procedural posture as the case at bar, e.g., where a plaintiff in a diversity suit was met with a motion by the defendant based on the

Arbitration Convention, likewise applied federal law. *Marchetto v. DeKalb Genetics Corp.,* 711 F.Supp. 936, 939 (N.D.Ill.1989).

1227 (S.D.N.Y.1987), *aff'd,* 842 F.2d 31 (2d Cir.1988). In this case, the second, third and fourth criteria are clearly satisfied, as the purported agreement provides for arbitration in Moscow, the Chilewich–Filanto relationship is a "commercial" relationship, and Filanto is an Italian corporation. The central disputed issue, therefore, is whether the correspondence between the parties, viewed in light of their business relationship, constitutes an "agreement in writing".

Courts interpreting this "agreement in writing" requirement have generally started their analysis with the plain language of the Convention, which requires "an arbitral clause in a contract or an arbitration agreement, signed by the parties or contained in an exchange of letters or telegrams", Article I(1), and have then applied that language in light of federal law, which consists of generally accepted principles of contract law, including the Uniform Commercial Code. *See, e.g., Genesco, supra,* at 845–46 (holding under "general contract principles" that buyer agreed to arbitrate disputes arising under unsigned sales confirmation forms due to parties' course of dealing and buyer's signatures on related sales confirmation forms); *Sen Mar, Inc. v. Tiger Petroleum Corp.,* 774 F.Supp. 879, 883–84 (S.D.N.Y.1991) (denying seller's motion to compel arbitration since arbitration clause not in signed writing or in exchange of letters); *Midland Bright Drawn Steel, supra,* 1989 WL 125788, at 4, 1989 U.S.Dist.Lexis 12368, at 3–4 (holding seller entitled to stay of arbitration since arbitration clause represented material alteration of contract not accepted by seller); *Beromun Aktiengesellschaft v. Societa Industriale Agricola, Inc.,* 471 F.Supp. 1163, 1171–72 (S.D.N.Y.1979) (denying seller's motion to compel arbitration since no contract ever formed between parties). *But see Astor Chocolate, supra,* at 33–34 (applying state contract law in case governed by Convention). *See also Zambia Steel & Building Supplies Ltd. v. James Clark &*

*Eaton Ltd.,* 2 Lloyd's Rep. 225 (1986) (United Kingdom) (seller's oral assent to sales note containing arbitration clause sufficient under Convention to compel arbitration).

■■■ However, as plaintiff correctly notes, the "general principles of contract law" relevant to this action, do *not* include the Uniform Commercial Code; rather, the "federal law of contracts" to be applied in this case is found in the United Nations Convention on Contracts for the International Sale of Goods (the "Sale of Goods Convention"), *codified at* 15 U.S.C. Appendix (West Supp.1991).[5] This Convention, ratified by the Senate in 1986, is a self-executing agreement which entered into force between the United States and other signatories, including Italy, on January 1, 1988. *See* Preface to Convention, *reprinted at* 15 U.S.C. Appendix (West Supp.1991). Although there is as yet virtually no U.S. case law interpreting the Sale of Goods Convention, *see* Taylor & Crisera, "U.N. Pact Has Wide Application", Nat.L.J., Dec. 23, 1991 at 23, it may safely be predicted that this will change: absent a choice-of-law provision, and with certain exclusions not here relevant, the Convention governs *all* contracts between parties with places of business in different nations, so long as both nations are signatories to the Convention. Sale of Goods Convention Article 1(1)(a). Since the contract alleged in this case most certainly was formed, if at all, after January 1, 1988, and since both the United States and Italy are signatories to the Convention, the Court will interpret the "agreement in writing" requirement of the Arbitration Convention in light of, and with reference to, the substantive international law of contracts embodied in the Sale of Goods Convention.

■■■ Not surprisingly, the parties offer varying interpretations of the numerous letters and documents exchanged between them. The Court will briefly summarize their respective contentions.

5. Of course, as with the Arbitration Convention, the Sale of Goods Convention is also "state law". U.S. Const. art. VI cl. 2; *Hauenstein v. Lynham,* 100 U.S. 483, 490, 25 L.Ed. 628 (1880) ("[T]he Constitution, laws, and treaties of the United States are as much a part of the law of every state as its own local laws and Constitution").

Defendant Chilewich contends that the Memorandum Agreement dated March 13 which it signed and sent to Filanto was an offer. It then argues that Filanto's retention of the letter, along with its subsequent acceptance of Chilewich's performance under the Agreement—the furnishing of the May 11 letter of credit—estops it from denying its acceptance of the contract. Although phrased as an estoppel argument, this contention is better viewed as an acceptance by conduct argument, e.g., that in light of the parties' course of dealing, Filanto had a duty timely to inform Chilewich that it objected to the incorporation by reference of all the terms of the Russian contract. Under this view, the return of the Memorandum Agreement, signed by Filanto, on August 7, 1990, along with the covering letter purporting to exclude parts of the Russian Contract, was ineffective as a matter of law as a rejection of the March 13 offer, because this occurred some five months after Filanto received the Memorandum Agreement and two months after Chilewich furnished the Letter of Credit. Instead, in Chilewich's view, this action was a proposal for modification of the March 13 Agreement. Chilewich rejected this proposal, by its letter of August 7 to Byerly Johnson, and the August 29 fax by Johnson to Italian Trading SRL, which communication Filanto acknowledges receiving. Accordingly, Filanto under this interpretation is bound by the written terms of the March 13 Memorandum Agreement; since that agreement incorporates by reference the Russian Contract containing the arbitration provision, Filanto is bound to arbitrate.

Plaintiff Filanto's interpretation of the evidence is rather different.[6] While Filanto apparently agrees that the March 13

Memorandum Agreement was indeed an offer, it characterizes its August 7 return of the signed Memorandum Agreement with the covering letter as a counteroffer. While defendant contends that under Uniform Commercial Code § 2–207 this action would be viewed as an acceptance with a proposal for a material modification, the Uniform Commercial Code, as previously noted does not apply to this case, because the State Department undertook to fix something that was not broken by helping to create the Sale of Goods Convention which varies from the Uniform Commercial Code in many significant ways. Instead, under this analysis, Article 19(1) of the Sale of Goods Convention would apply. That section, as the Commentary to the Sale of Goods Convention notes, reverses the rule of Uniform Commercial Code § 2–207, and reverts to the common law rule that "A reply to an offer which purports to be an acceptance but contains additions, limitations or other modifications is a rejection of the offer and constitutes a counter-offer". Sale of Goods Convention Article 19(1). Although the Convention, like the Uniform Commercial Code, does state that non-material terms do become part of the contract unless objected to, Sale of Goods Convention Article 19(2), the Convention treats inclusion (or deletion) of an arbitration provision as "material", Sale of Goods Convention Article 19(3).[7] The August 7 letter, therefore, was a counteroffer which, according to Filanto, Chilewich accepted by its letter dated September 27, 1990. Though that letter refers to and acknowledges the "contractual obligations" between the parties, it is doubtful whether it can be characterized as an acceptance.

More generally, both parties seem to have lost sight of the narrow scope of the

---

6. Plaintiff has also argued that *none* of the Russian Contract was effectively incorporated by reference into the Memorandum Agreement and that the arbitration clause in the Russian Contract was not a sufficient agreement to arbitrate. Plaintiff's Memorandum of Law at 5–10. These arguments, however, appear to be premised on New York law; in any event, both are palpably without merit, as Filanto had a copy of the Russian Contract and the arbitration clause therein is plainly a sufficient agreement to arbitrate under federal law. *Oriental Commercial &*

*Shipping Co. v. Rosseel, N.V.,* 609 F.Supp. 75, 76 (S.D.N.Y.1985) (clause providing "Arbitration: if required in New York City" sufficient agreement to arbitrate).

7. It should also be noted that, in provisions potentially relevant to this motion, the Convention essentially rejects both the Statute of Frauds and the parol evidence rule. Sale of Goods Convention Article 11; Article 8(3).

inquiry required by the Arbitration Convention. *Ledee, supra,* at 186. All that this Court need do is to determine if a sufficient "agreement in writing" to arbitrate disputes exists between these parties. *Cf. United Steelworkers of America v. Warrior & Gulf Co.,* 363 U.S. 574, 582, 80 S.Ct. 1347, 1352–53, 40 L.Ed.2d 1409 (1960) (party cannot be required to submit to arbitration absent agreement). Although that inquiry is informed by the provisions of the Sale of Goods Convention, the Court lacks the authority on this motion to resolve all outstanding issues between the parties. Indeed, contracts and the arbitration clauses included therein are considered to be "severable", a rule that the Sale of Goods Convention itself adopts with respect to avoidance of contracts generally. Sale of Goods Convention Article 81(1). There is therefore authority for the proposition that issues relating to existence of the contract, as opposed to the existence of the arbitration clause, are issues for the arbitrators:

> "The district court reasoned that an arbitrator can derive his or her power only from a contract, so that when there is a challenge to the existence of the contract itself, the court must first decide whether there is a valid contract between the parties. Although this appears logical, it goes beyond the requirements of the statute and violates the clear directive of *Prima Paint*, 388 U.S. at 404, 87 S.Ct. at 1806 ..." *Republic of Nicaragua v. Standard Fruit Co.,* 937 F.2d 469, 476 n. 9 (9th Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 1294, 117 L.Ed.2d 516 (1992).

The *Standard Fruit* court is technically correct in its interpretation of the *Prima Paint* case, which drew a distinction between a challenge to the validity of the contract itself and a challenge to the validity of the arbitration clause; the former, in the Court's view, was a question for the arbitrators, while the latter was a question for the court. *Prima Paint, supra,* 388 U.S. at 404, 87 S.Ct. at 1806.

However, there are often limits to how many angels can dance on the head of a pin—even when the performance is choreographed by the distinguished courts just cited. There seems, for example, to be some confusion in the Ninth Circuit itself about the proper application of the *Prima Paint* rule, as a case decided six months prior to *Standard Fruit* shows. *See Three Valleys Municipal Water District v. E.F. Hutton & Co. Inc.,* 925 F.2d 1136, 1138–42 (9th Cir.1991) (holding whether contract containing arbitration clause formed initially question for court). There are numerous cases in the Second Circuit where the court has-out of necessity—adjudicated relevant contract issues on motions to stay or compel arbitration. *See, e.g., McPheeters, supra,* at 773 (holding that defendant seeking arbitration not third-party beneficiary of underlying agreement); *Genesco, supra,* at 846 ("We focus not on whether there was subjective agreement as to each clause in the contract, but on whether there was objective agreement with respect to the entire contract") (citation omitted); *Maria Victoria Naviera, S.A. v. Cementos Del Valle, S.A.,* 759 F.2d 1027, 1030 (2d Cir. 1985) (holding that contract containing arbitration clause was not modified by later agreement); *Midland Bright Drawn Steel,* 1989 WL 125788 at 2–4, 1989 U.S.Dist.Lexis 12368 at 3 (resolving date when underlying contract formed and holding that contract did not include arbitration clause); *Beromun Aktiengesellschaft, supra,* at 1172 (denying motion to compel arbitration since "no contract ever existed between parties").

Since the issue of whether and how a contract between these parties was formed is obviously related to the issue of whether Chilewich breached any contractual obligations, the Court will direct its analysis to whether there was objective conduct evidencing an intent to be bound with respect to the arbitration provision. *Cf. Matterhorn, Inc., v. NCR Corp.,* 763 F.2d 866, 871–73 (7th Cir.1985) (Posner, J.) (discussing cases). *See also Teledyne, Inc. v. Kone Corp.,* 892 F.2d 1404, 1410 (9th Cir. 1990) (arbitration clause enforceable despite later finding by arbitrator that contract itself invalid).

The Court is satisfied on this record that there *was* indeed an agreement to arbitrate between these parties.

There is simply no satisfactory explanation as to why Filanto failed to object to the incorporation by reference of the Russian Contract in a timely fashion. As noted above, Chilewich had in the meantime commenced its performance under the Agreement, and the Letter of Credit it furnished Filanto on May 11 *itself* mentioned the Russian Contract. An offeree who, knowing that the offeror has commenced performance, fails to notify the offeror of its objection to the terms of the contract within a reasonable time will, under certain circumstances, be deemed to have assented to those terms. Restatement (Second) of Contracts § 69 (1981); *Graniteville v. Star Knits of California, Inc.*, 680 F.Supp. 587, 589–90 (S.D.N.Y.1988) (compelling arbitration since party who failed timely to object to salesnote containing arbitration clause deemed to have accepted its terms); *Imptex International Corp. v. Lorprint, Inc.*, 625 F.Supp. 1572, 1572 (S.D.N.Y.1986) (Weinfeld, J.) (party who failed to object to inclusion of arbitration clause in sales confirmation agreement bound to arbitrate). The Sale of Goods Convention itself recognizes this rule: Article 18(1), provides that "A statement made by or other conduct of the offeree indicating assent to an offer is an acceptance". Although mere "silence or inactivity" does not constitute acceptance, Sale of Goods Convention Article 18(1), the Court may consider previous relations between the parties in assessing whether a party's conduct constituted acceptance, Sale of Goods Convention Article 8(3). In this case, in light of the extensive course of prior dealing between these parties, Filanto was certainly under a duty to alert Chilewich in timely fashion to its objections to the terms of the March 13 Memorandum Agreement—particularly since Chilewich had repeatedly referred it to the Russian Contract and Filanto had had a copy of that document for some time.

There are three other convincing manifestations of Filanto's true understanding of the terms of this agreement. First, Filanto's Complaint in this action, as well as affidavits subsequently submitted to the Court by Mr. Filograna, refer to the *March 13* contract: the Complaint, for example, states that "On or about March 13, 1990, Filanto entered into a contract with Chilewich ...". Complaint at ¶ 5. These statements clearly belie Filanto's *post hoc* assertion that the contract was actually formed at some point after that date. Indeed, Filanto finds itself in an awkward position: it has sued on a contract whose terms it must now question, in light of the defendant's assertion that the contract contains an arbitration provision. This situation is hardly unknown in the context of arbitration agreements. *See Tepper Realty Co., v. Mosaic Tile Co.*, 259 F.Supp. 688, 692 (S.D.N.Y.1966) ("In short, the plaintiffs cannot have it both ways. They cannot relay on the contract, when it works to their advantage, and repudiate it when it works to their disadvantage").

Second, Filanto *did* sign the March 13 Memorandum Agreement. That Agreement, as noted above, specifically referred to the incorporation by reference of the arbitration provision in the Russian Contract; although Filanto, in its August 7 letter, did purport to "have to respect" only a small part of the Russian Contract, Filanto in that very letter noted that it was returning the March 13 Memorandum Agreement *"signed for acceptance"*. Exhibit A to November 28 Filograna Affidavit (emphasis added). In light of Filanto's knowledge that Chilewich had already performed its part of the bargain by furnishing it the Letter of Credit, Filanto's characterization of this action as a rejection and a counteroffer is almost frivolous.

Third, and most important, Filanto, in a letter to Byerly Johnson dated June 21, 1991, explicitly stated that "[t]he April Shipment and the September shipment are governed by the Master Purchase Contract of February 28, 1989 [the Russian Contract]". Exhibit H to December 4 Simon Chilewich Affidavit. Furthermore, the letter, which responds to claims by Johnson that some of the boots that *were* supplied were defective, expressly relies on section 9 of the Russian Contract—another section which Filanto had in its earlier correspondence purported to exclude. The Sale of Goods Convention specifically directs that

"[i]n determining the intent of a party ... due consideration is to be given to ... any subsequent conduct of the parties", Sale of Goods Convention Article 8(3). In this case, as the letter post-dates the partial performance of the contract, it is particularly strong evidence that Filanto recognized itself to be bound by *all* the terms of the Russian Contract.

■ In light of these factors, and heeding the presumption in favor of arbitration, *Moses H. Cone, supra,* at 24–26, 103 S.Ct. at 941–42, which is even stronger in the context of international commercial transactions, *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 631, 105 S.Ct. 3346, 3356, 87 L.Ed.2d 444 (1985), the Court holds that Filanto is bound by the terms of the March 13 Memorandum Agreement, and so must arbitrate its dispute in Moscow.[8]

### Remedy

■ Having determined that the parties should arbitrate their disputes in accordance with their agreement, the Court must address the question of remedy. As this action is governed by the Convention and its implementing legislation, the Court has specific authority to order the parties to proceed to arbitration in Moscow. 9 U.S.C. § 206 (West Supp.1991) ("A Court having jurisdiction under this Chapter may direct that arbitration be held in accordance with the agreement at any place therein provided for, whether the place is within or without the United States"). Defendant has not sought this remedy, since it would likewise be the defendant in the arbitration. However, it would be clearly inequitable to permit the party contending that there is

an arbitration agreement to avoid arbitration. In the interests of justice, the Court will compel the parties to arbitrate in Moscow. *Cf. Tennessee Imports, supra,* at 1322 n. 4 (treating defendant's motion to dismiss as request to refer parties to arbitration).

There may be some theoretical question as to whether the remedy defendant *does* seek—a stay under 9 U.S.C. § 3—is available in a case falling under the Convention. The problem here is that Chapter 2 of the Act—the Convention and its implementing legislation—does not expressly grant the Court authority to stay an action pending arbitration. Chapter 1 of the Arbitration Act, which governs arbitration agreements relating primarily to *interstate* commerce, does make a stay available, 9 U.S.C. § 3 (West 1970). Furthermore, 9 U.S.C. § 208, the final section of the statute implementing the Convention, states that Chapter 1 of the Act applies to Chapter 2 cases when not in conflict with Chapter 2.

■ Some courts have suggested that the language of Article II(3) of the Convention, which states that a court "shall refer the parties to arbitration" once the requirements of the Convention have been satisfied means, by negative implication, that a stay is not permitted. According to these courts, the proper remedy in a Convention case is to refer the parties to arbitration and dismiss for lack of subject matter jurisdiction. *McCreary Tire & Rubber Co. v. CEAT S.p.A.,* 501 F.2d 1032, 1037 (3d Cir. 1974) (dismissal required); *Astor Chocolate,* 704 F.Supp. at 35 (same); *Siderius, Inc., v. Compania de Acero del Pacifico, SA,* 453 F.Supp. 22, 25 (S.D.N.Y.1978) (same). This is facially absurd because the enabling legislation gives the district court

---

**8.** There appears to be some disagreement about whether this presumption applies when the question before the Court is the existence, as opposed to the scope, of the arbitration agreement. *Compare Volt Information Sciences, Inc., v. Leland Stanford, Jr. University,* 489 U.S. 468, 487 n. 8, 109 S.Ct. 1248, 1260 n. 8, 103 L.Ed.2d 488 (1989) (Brennan, J., dissenting) ("Section 2 of the FAA requires courts to enforce agreements to arbitrate, and in *Moses H. Cone* we held that doubts as to whether the parties had so agreed were to be resolved in favor of arbitration") *with In the Matter of Arbitration be-*

*tween Chevron U.S.A., Inc. v. Consolidated Edison Co. of New York, Inc.,* 872 F.2d 534, 537 (2d Cir.1989) ("Application of the presumption [in favor of arbitration] is constrained by the fact that the source of any obligation to arbitrate is the contract between the parties ...") and *DeMarco California Fabrics, Inc. v. Nygard International, Ltd.,* 1990 WL 48073 at 4, 1990 U.S.Dist.Lexis 3842 at 5 (S.D.N.Y.1990) ("... the federal policy favoring arbitration is most applicable in determining the scope of arbitration agreements, rather than whether an arbitration agreement actually exists") (citation omitted).

the power at least to compel arbitration. How could even this limited power be exercised without subject matter jurisdiction?

Other courts, have concluded that granting a stay pending arbitration is permissible in Convention cases. *E.g., Rhone Mediterranee Compagnia Francese Di Assicurazioni E Riassicurazoni v. Lauro,* 712 F.2d 50, 54 (3d Cir.1983). Our own Court of Appeals seemed to adopt this position, as it recently countenanced an injunction in aid of arbitration in a Convention case, *Borden, Inc. v. Meiji Milk Products Co., Ltd.,* 919 F.2d 822, 826 (2d Cir.1990), *cert. denied,* — U.S. ——, 111 S.Ct. 2259, 114 L.Ed.2d 712 (1991). In a more recent case, though, with facts closer to those in the instant case, another panel of that court expressly declined to follow *Borden,* or resolve the issue of whether a stay or dismissal is appropriate, *Threlkeld, supra,* at 253 n. 2. *See also Tennessee Imports, supra,* at 1323–25 (reviewing cases and holding that stay and dismissal are both permissible methods of referral under the Convention); Restatement (Third) of the Foreign Relations Law of the United States § 487(2) (1980) (same).

This Court agrees in theory with those courts which have held that retaining jurisdiction but staying the action is consistent with the commands of the Convention. However, to do so in this case would serve no purpose, since the entire controversy between these parties is subject to and will be resolved by arbitration. Accordingly, it is appropriate that a final judgment issue here containing a mandatory injunction to arbitrate in accordance with the Convention and what this Court finds to be the agreement of the parties.

Lastly, the plaintiff contends that if this Court does order arbitration, the Court should take judicial notice of the unsettled conditions in Moscow and order arbitration to proceed in this judicial district. The language of section 206 is concededly permissive: the Court "may direct that arbitration be held in accordance with the agreement at any place therein provided for". 9 U.S.C. § 206 (West Supp.1991). These parties, though, did agree to arbitrate their disputes in Moscow. *Compare Oil Basins Ltd. v. Broken Hill Proprietary Co., Ltd.,* 613 F.Supp. 483, 486–87 (S.D.N.Y.1985) (section 206 furnishes sole authority for court to order arbitration outside its judicial district) *with Bauhinia Corp. v. China National Machinery & Equipment Import & Export Corp.,* 819 F.2d 247 (9th Cir.1987) (ordering arbitration before American Arbitration Association when parties' agreements ambiguous as to arbitration site).

Plaintiff relies on cases which have stated or held that forum-selection clauses may be invalidated when the chosen forum has become seriously inconvenient or dangerous. *The Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 16, 92 S.Ct. 1907, 1916–17, 32 L.Ed.2d 513 (1972) (noting that invalidation of forum-selection clause appropriate when chosen forum "*seriously* inconvenient") (emphasis in original); *Rockwell International Systems, Inc. v. Citibank, N.A.,* 719 F.2d 583, 587–88 (2d Cir.1983) (no adequate remedy in courts of post-revolutionary Iran). Whatever the applicability of these cases in the arbitration context, the chosen forum in this case does have a reasonable relation to the contract at issue, as the ultimate purchaser of the boots was a Russian concern and the Russian Contract was incorporated by reference into Filanto's Memorandum Agreement with Chilewich. Furthermore, though conditions in the Republic of Russia are unsettled, they continue to improve and there is no reason to believe that the Chamber of Commerce in Moscow cannot provide fair and impartial justice to these litigants.

Settle a final judgment on five (5) days notice.

SO ORDERED.