# In the
# United States Court of Appeals
## For the Seventh Circuit

Nos. 01-3402, 02-1867, 02-1915

ZAPATA HERMANOS SUCESORES, S.A.,

*Plaintiff-Appellee,*

v.

HEARTHSIDE BAKING COMPANY, INC.,
  d/b/a MAURICE LENELL COOKY COMPANY,

*Defendant-Appellant.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 C 4040—**Milton I. Shadur**, *Judge.*

ARGUED SEPTEMBER 13, 2002—DECIDED NOVEMBER 19, 2002

Before POSNER, DIANE P. WOOD, and EVANS, *Circuit Judges.*

POSNER, *Circuit Judge.* Zapata, a Mexican corporation that supplied Lenell, a U.S. wholesale baker of cookies, with cookie tins, sued Lenell for breach of contract and won. The district judge ordered Lenell to pay Zapata $550,000 in attorneys' fees. From that order, which the judge based both on a provision of the Convention on Contracts for the International Sale of Goods, Jan. 1, 1988, 15 U.S.C. App., and on the inherent authority of the courts to punish the conduct of litigation in bad faith, Lenell appeals.

The Convention, of which both the U.S. and Mexico are signatories, provides, as its name indicates, remedies for breach of international contracts for the sale of goods. Zapata brought suit under the Convention for money due under 110 invoices, amounting to some $900,000 (we round liberally), and also sought prejudgment interest plus attorneys' fees, which it contended are "losses" within the meaning of the Convention and are therefore an automatic entitlement of a plaintiff who prevails in a suit under the Convention. At the close of the evidence in a one-week trial, the judge granted judgment as a matter of law for Zapata on 93 of the 110 invoices, totaling $850,000. Zapata's claim for money due under the remaining invoices was submitted to the jury, which found in favor of Lenell. Lenell had filed several counterclaims; the judge dismissed some of them and the jury ruled for Zapata on the others. The jury also awarded Zapata $350,000 in prejudgment interest with respect to the 93 invoices with respect to which Zapata had prevailed, and the judge then tacked on the attorneys' fees—the entire attorneys' fees that Zapata had incurred during the litigation.

Article 74 of the Convention provides that "damages for breach of contract by one party consist of a sum equal to the loss, including loss of profit, suffered by the other party as a consequence of the breach," provided the consequence was foreseeable at the time the contract was made. Article 7(2) provides that "questions concerning matters governed by this Convention which are not expressly settled in it are to be settled in conformity with the general principles on which it is based or, in the absence of such principles, in conformity with the law applicable by virtue of the rules of private international law [i.e., conflicts of law rules]." There is no suggestion in the background of the Convention or the cases under it that "loss"

was intended to include attorneys' fees, but no suggestion to the contrary either. Nevertheless it seems apparent that "loss" does not include attorneys' fees incurred in the litigation of a suit for breach of contract, though certain pre-litigation legal expenditures, for example expenditures designed to mitigate the plaintiff's damages, would probably be covered as "incidental" damages. *Sorenson v. Fio Rito*, 413 N.E.2d 47, 50-52 (Ill. App. 1980); cf. *Tull v. Gundersons, Inc.*, 709 P.2d 940, 946 (Colo. 1985); *Restatement (Second) of Contracts* § 347, comment c (1981).

The Convention is about contracts, not about procedure. The principles for determining when a losing party must reimburse the winner for the latter's expense of litigation are usually not a part of a substantive body of law, such as contract law, but a part of procedural law. For example, the "American rule," that the winner must bear his own litigation expenses, and the "English rule" (followed in most other countries as well), that he is entitled to reimbursement, are rules of general applicability. They are not field-specific. There are, however, numerous exceptions to the principle that provisions regarding attorneys' fees are part of general procedure law. For example, federal antidiscrimination, antitrust, copyright, pension, and securities laws all contain field-specific provisions modifying the American rule (as do many other field-specific statutes). An international convention on contract law *could* do the same. But not only is the question of attorneys' fees not "expressly settled" in the Convention, it is not even mentioned. And there are no "principles" that can be drawn out of the provisions of the Convention for determining whether "loss" includes attorneys' fees; so by the terms of the Convention itself the matter must be left to domestic law (i.e., the law picked out by "the rules of private international law," which means the rules governing choice of law in international legal disputes).

U.S. contract law is different from, say, French contract law, and the general U.S. rule on attorneys' fee shifting (the "American rule") is different from the French rule (loser pays). But no one would say that French contract law differs from U.S. *because* the winner of a contract suit in France is entitled to be reimbursed by the loser, and in the U.S. not. That's an important difference but not a contract-law difference. It is a difference resulting from differing procedural rules of general applicability.

The interpretation of "loss" for which Zapata contends would produce anomalies, which is another reason to reject the interpretation. On Zapata's view the prevailing plaintiff in a suit under the Convention would (though presumably subject to the general contract duty to mitigate damages, to which we referred earlier) get his attorneys' fees reimbursed more or less automatically (the reason for the "more or less" qualification will become evident in a moment). But what if the defendant won? Could he invoke the domestic law, if as is likely other than in the United States that law entitled either side that wins to reimbursement of his fees by the loser? Well, if so, could the plaintiff waive his right to attorneys' fees under the Convention in favor of domestic law, which might be more or less generous than Article 74, since Article 74 requires that any loss must, to be recoverable, be foreseeable, which beyond some level attorneys' fees, though reasonable ex post, might not be? And how likely is it that the United States would have signed the Convention had it thought that in doing so it was abandoning the hallowed American rule? To the vast majority of the signatories of the Convention, being nations in which loser pays is the rule anyway, the question whether "loss" includes attorneys' fees would have held little interest; there is no reason to suppose they thought about the question at all.

For these reasons, we conclude that "loss" in Article 74 does not include attorneys' fees, and we move on to the question of a district court's inherent authority to punish a litigant or the litigant's lawyers for litigating in bad faith. The district judge made clear that he was basing his award of attorneys' fees to Zapata in part on his indignation at Lenell's having failed to pay money conceded to be owed to Zapata. Although the precise amount was in dispute, Lenell concedes that it owed Zapata at least half of the $1.2 million that Zapata obtained in damages (not counting the attorneys' fees) and prejudgment interest. Lenell had no excuse for not paying that amount, and this upset the judge.

Firms should pay their debts when they have no legal defense to them. *Pacta sunt servanda*, as the saying goes ("contracts are to be obeyed"). In the civil law (that is, the legal regime of Continental Europe), this principle is taken very seriously, as illustrated by the fact that the civil law grants specific performance in breach of contract cases as a matter of course. But under the common law (including the common law of Illinois, which is the law that choice of law principles make applicable in this case to any issues not covered in express terms by the Convention), a breach of contract is not considered wrongful activity in the sense that a tort or a crime is wrongful. When we delve for reasons, we encounter Holmes's argument that practically speaking the duty created by a contract is really just to perform or pay damages, for only if damages are inadequate relief in the particular circumstances of the case will specific performance be ordered. In other words, and subject to the qualification just mentioned, the entire practical effect of signing a contract is that by doing so one obtains an option to break it. The damages one must pay for breaking the contract are simply the price if the option is exercised. See Oliver Wendell

Holmes, Jr., *The Common Law* 300-02 (1881); Holmes, "The Path of the Law," 10 *Harv. L. Rev.* 457, 462 (1897).

Why such lenity? Perhaps because breach of contract is a form of strict liability. Many breaches are involuntary and so inapt occasions for punishment. Even deliberate breaches are not necessarily culpable, as they may enable an improvement in efficiency—suppose Lenell had a contract to take a certain quantity of tins from Zapata and found that it could buy them for half the price from someone else. Some breaches of contract, it is true, are not only deliberate but culpable, and maybe this was one—Lenell offers no excuse for failing to pay for tins that it had taken delivery of and presumably resold with its cookies in them. Refusing to pay the contract price after the other party has performed is not the kind of option that the performing party would willingly have granted when the contract was negotiated. The option of which Holmes spoke was the option not to perform because performance was impossible or because some more valuable use of the resources required for performance arose after the contract was signed. Zapata argues, moreover, perhaps correctly (we need not decide), that Lenell refused to pay in an effort to extract a favorable modification of the terms of the parties' dealings, which would be a form of duress if Zapata somehow lacked an effective legal remedy. *Professional Service Network, Inc. v. American Alliance Holding Co.*, 238 F.3d 897, 900-01 (7th Cir. 2001); *Alaska Packers' Ass'n v. Domenico*, 117 Fed. 99, 100-04 (9th Cir. 1902). But Zapata did not charge duress, and probably couldn't, since it had a good remedy—this suit.

It is true that nowadays common law courts will sometimes award punitive damages for breach of contract in bad faith. But outside the field of insurance, where refusals in bad faith to indemnify or defend have long been punishable by awards of punitive damages to the insured,

the plaintiff must show that the breach of contract involved tortious misconduct, such as duress or fraud or abuse of fiduciary duty. See, e.g., *Miller Brewing Co. v. Best Beers of Bloomington, Inc.*, 608 N.E.2d 975, 982-83 (Ind. 1993); *Story v. City of Bozeman*, 791 P.2d 767, 776 (Mont. 1990); E. Allan Farnsworth, *Contracts* § 12.8, pp. 788-89 (3d ed. 1999). This is the rule in Illinois, *Morrow v. L.A. Goldschmidt Associates, Inc.*, 492 N.E.2d 181, 183-86 (Ill. 1986), and Zapata has not tried to come within it. For that matter, it did not ask for punitive damages, and the judge had no authority to award attorneys' fees in lieu of such damages. He could not have awarded punitive damages if Zapata had asked for them but had been unable to prove tortious misconduct by Lenell, and even more clearly he could not award them when they had not been requested.

The decision whether punitive damages shall be a sanction for a breach of contract is an issue of substantive law, and under the *Erie* doctrine a federal court is not authorized to apply a different substantive law of contracts in a diversity case from the law that a state court would apply were the case being litigated in a state court instead. And obviously that rule must not be circumvented by renaming punitive damages "attorneys' fees." *United States ex rel. Treat Bros. Co. v. Fidelity & Deposit Co. of Maryland*, 986 F.2d 1110, 1119-20 (7th Cir. 1993); see also *Chambers v. NASCO, Inc.*, 501 U.S. 32, 52-55 (1991); *Association of Flight Attendants, AFL-CIO v. Horizon Air Industries, Inc.*, 976 F.2d 541, 548-50 (9th Cir. 1992). It is true that this is not a diversity case, but the *Erie* doctrine applies to any case in which state law supplies the rule of decision, see, e.g., *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 83-85, 87-88 (1994), here by incorporation in the Convention.

The inherent authority of federal courts to punish misconduct before them is not a grant of authority to do

good, rectify shortcomings of the common law (as by using an award of attorneys' fees to make up for an absence that the judge may deem regrettable of punitive damages for certain breaches of contract), or undermine the American rule on the award of attorneys' fees to the prevailing party in the absence of statute. *Morganroth & Morganroth v. DeLorean*, 213 F.3d 1301, 1318 (10th Cir. 2000); *Association of Flight Attendants, AFL-CIO v. Horizon Air Industries, Inc., supra*, 976 F.2d at 548-50 (9th Cir. 1992); *Shimman v. International Union of Operating Engineers, Local 18*, 744 F.2d 1226, 1232-33 and n. 9 (6th Cir. 1984) (en banc). These cases and others we could cite make clear that it is a residual authority, to be exercised sparingly, to punish misconduct (1) occurring in the litigation itself, not in the events giving rise to the litigation (for then the punishment would be a product of substantive law—designed, for example, to deter breaches of contract), and (2) not adequately dealt with by other rules, most pertinently here Rules 11 and 37 of the Federal Rules of Civil Procedure, which Lenell has not been accused of violating.

Insofar as he focused on Lenell's behavior in the litigation itself, which, to repeat, is the only lawful domain of the relevant concept of "inherent authority"—the authority could not constitutionally be extended to give parties remedies not available to them under the law of the state that furnishes the substantive rules of decision in the case—the judge punished Lenell for having failed to acknowledge liability and spare Zapata and the judge and the jury and the witnesses and so on the burden of a trial. But as it happens, the fault here was in no small measure the judge's. Well before the trial, and long, long before Zapata's lawyers had run the tab up to $550,000, they had moved for partial summary judgment, claiming that Lenell in answer to Zapata's requests for admission had acknowledged liability for $858,000 of the $890,000 sought

in the complaint. The judge had denied the motion on the ground that partial summary judgment cannot be granted unless the grant would give rise to an appealable judgment. This was error. Rule 56(d) of the civil rules is explicit in allowing the judge to grant summary judgment on less than the plaintiff's whole claim, and there is no hint of any requirement that the grant carve at a joint that would permit the judge to enter a final judgment under Rule 54(b). If the plaintiff had two separate claims, and the judge granted summary judgment on one and set the other for trial, he could also if he wanted enter final judgment on the first dismissal, enabling the defendant to appeal immediately under Rule 54(b). If instead the plaintiff had as here one claim, and the judge granted it in part, the defendant could not appeal—the conditions of Rule 54(b) would not be satisfied—yet it is evident from the wording of Rule 56(d) that this would be a proper partial summary judgment, for the rule expressly authorizes an order "specifying the facts that appear without substantial controversy, including the extent to which the amount of damages or other relief is not in controversy." No purpose would be served by confining the rule as the district judge did. If anything, judicial economy is better served by a partial summary judgment that is *not* appealable, since a Rule 54(b) appeal normally interrupts the proceedings in the district court.

Since the challenged award of $550,000 in attorneys' fees cannot stand, we need not pick through the record to see whether some of the counterclaims or other moves by Zapata during the trial were sanctionable apart from Rule 11 and Rule 37. But it may be useful by way of guiding further proceedings on remand to point out that to the extent that those rules place limits on the award of sanctions under them (for example by the provision of safe harbors in Rule 11), those limitations are equally limita-

tions on inherent authority, which may not be used to amend the rules. *Kovilic Construction Co. v. Missbrenner*, 106 F.3d 768, 772-73 (7th Cir. 1997). For federal rules of procedure have the force of statutes. See *id.*; 28 U.S.C. § 2072(b).

One issue remains for discussion. Although we have treated the appeal so far as if the only issues concerned attorneys' fees, Lenell also argues that the jury verdict should be set aside because the judge by his comments in open court signaled to the jury his scorn for Lenell's case. There were only a couple of such comments (many more, however, at sidebars outside the jury's hearing), and we do not think they could have changed the outcome. But we also think that judges should be very cautious about making comments in the hearing of a jury about the quality of a party's case or lawyers. For if he signals to the jury the judge's opinion as to how the case should be decided, he undermines the authority of the jury. *Collins v. Kibort*, 143 F.3d 331, 336 (7th Cir. 1998); *Nationwide Mutual Fire Ins. Co. v. Ford Motor Co.*, 174 F.3d 801, 805, 808 (6th Cir. 1999); see also *Ross v. Black & Decker, Inc.*, 977 F.2d 1178, 1187 (7th Cir. 1992).

From what we have just reported about the judge's statements during the trial and from the tone of a number of other statements that he made in the course of this litigation, we think it best that the further proceedings that we are ordering be conducted before a different judge, in accordance with 7th Cir. R. 36.

REVERSED AND REMANDED.

Nos. 01-3402, 02-1867, 02-1915                                    11

A true Copy:

     Teste:

                                  _____
                                 *Clerk of the United States Court of*
                                   *Appeals for the Seventh Circuit*