In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 04-4302

SQUARE D COMPANY AND SUBSIDIARIES,

*Petitioner-Appellant*,

*v.*

COMMISSIONER OF THE INTERNAL REVENUE SERVICE,

*Respondent-Appellee.*

———————

Appeal from an Order of the
United States Tax Court.
No. 6067-97

———————

ARGUED OCTOBER 25, 2005—DECIDED FEBRUARY 13, 2006

———————

Before COFFEY, MANION, and KANNE, *Circuit Judges.*

MANION, *Circuit Judge.* Square D Company attempted
to take deductions for certain interest payments to its French
parent that accrued in 1991 and 1992. Relying on Treasury
Regulation § 1.267(a)-3, the Commissioner of the Internal
Revenue Service adopted the position that any such deduc-
tions had to be taken when the interest payments were
actually made, not when they accrued. Square D challenged
this regulation and the Commissioner's actions before the
Tax Court. The Tax Court sided with the Commissioner,
and we affirm.

## I.

Square D Company ("Square D") and the Commissioner of the Internal Revenue Service (the "Commissioner") agree on nearly all of the pertinent facts and stipulated to them in the Tax Court. Before diving into the particulars, however, we will sketch the relevant tax code sections and regulations[1] because these provisions supply not only the frame, but also the subject of the disagreement between the parties.

The Internal Revenue Code (the "Code") allows a taxpayer to take a deduction on all interest paid or accrued within a taxable year on indebtedness. IRC § 163(a). Other provisions of the Code determine which of these two alternatives—a deduction in the year of accrual or payment—applies. Generally, corporations with gross receipts of more than $5 million are accrual-basis taxpayers that must use the accrual method of accounting. IRC § 448(a), (b)(3). Under the accrual method, a taxpayer must include income and deductions in the taxable year in which the income or liability is fixed and can be determined with "reasonable accuracy." Treas. Reg. § 1.446-1(c)(ii). This compares to the other primary accounting method, the cash method, under which a taxpayer must include all income and deductions in the taxable year in which they are actually received or paid. IRC § 446(c)(1), (2); Treas. Reg. § 1.446-1(c)(i).

---

[1] As all of the citations to statutory material in this case involve sections of the Internal Revenue Code, found at 26 U.S.C. § 1 et seq., we will refer to the pertinent provisions using the abbreviation "IRC." Likewise, for the significant regulations we will substitute "Treas. Reg." for "26 C.F.R."

Special rules govern if a taxpayer attempts to take a deduction based on a transaction with a related person or corporation. IRC § 267. As a general matter, a taxpayer cannot take a deduction for a loss from a sale or exchange of property with a related person. IRC § 267(a)(1). A taxpayer can, however, claim a deduction for other types of payments to a related person. IRC § 267(a)(2). However, if the parties employ different systems of accounting, the taxpayer can obtain this deduction only in the taxable year in which the related payee claims the income. *Id*. ("any deduction allowable under this chapter in respect of such amount shall be allowable as of the day as of which such amount is includible in the gross income of the person to whom the payment is made."). The determination of when a taxpayer can claim this deduction, therefore, depends on which method of accounting the related payee employs. If the related payee is on the accrual method, the taxpayer will claim the deduction when it accrued, even if the taxpayer is on the cash method. Likewise, if the related payee is on the cash method, the taxpayer will claim the deduction when it pays the money, even if it reports on the accrual basis.

The Code treats payments to a foreign related party separately, granting the Secretary of the Treasury (the "Secretary") power to enact regulations in this sphere. Specifically, IRC § 267(a)(3) provides that the "Secretary shall by regulations apply the matching principle of [§ 267 (a)(2)] in cases in which the person to whom the payment is to be made is not a United States person." In response to this directive, the Secretary promulgated Treasury Regulation § 1.267(a)-3. In general, this regulation provides for the cash method of accounting when claiming deductions for payments to a related foreign person. Treas. Reg. § 1.267(a)-3(b). The regulations, however, proceed to exempt certain types of payment to a

related foreign person from the cash method of Treasury Regulation § 1.267(a)-3(b) and IRC § 267 (a)(2). Treas. Reg. § 1.267 (a)-3(c)(2). This exemption applies "to any amount that is income of a related foreign person with respect to which the related foreign person is exempt from United States taxation on the amount owed pursuant to a treaty obligation of the United States," *except* for interest. *Id*. In the case of interest that is not effectively connected income of the related foreign person,[2] the cash method of Treas. Reg. § 1.267 (a)-3(b) continues to govern. *Id*.

Having swallowed this preliminary dose of the Code and its regulations, we proceed to the relevant facts of the present case. Square D is an accrual basis taxpayer with its principal place of business in Illinois. Schneider S.A. ("Schneider"), a French corporation, acquired Square D on May 30, 1991. While the precise mechanics of the deal are not particularly important for our purposes, basically Schneider created an acquisition subsidiary through which it financed the purchase of Square D's stock in the amount of $2.25 billion. As part of this arrangement, the acquisition subsidiary obtained loans in the amount of $328 million from Schneider and two of its affiliates. After the purchase of Square D, Schneider then merged the acquisition subsidiary (and its massive loans) into Square D, thus passing the responsibility for repaying the loans to

---

[2] We will spare the readers from a long discussion of what is or is not effectively connected income of a foreign company. The parties have stipulated that the interest accrued and paid was: (1) not includible in the gross income of Schneider or its affiliates for United States federal income tax purposes; (2) derived from sources within the United States for United States federal income tax purposes; and (3) not effectively connected with the conduct of a United States trade or business.

Square D. In 1992, Square D obtained a direct loan from Schneider in the amount of $80 million. Square D accrued $21,075,101 in interest on these loans in 1991 and $38,541,695 in 1992, but did not attempt to deduct these amounts in its tax returns for those years. Square D then paid off the interest on these loans in 1995 and 1996. As Schneider and its affiliates (excluding Square D) were bona fide residents of France, they were exempt from United States taxes on the interest payments because of treaties.

As part of a 1996 audit, the IRS determined that Square D had a tax deficiency in 1991 and 1992. Square D challenged this determination before the Tax Court in part by arguing that it should be allowed to deduct the loan interest amounts in the years in which they accrued, 1991 and 1992.[3] More specifically, Square D contended that Treasury Regulation § 1.267(a)-3 constituted a flawed interpretation of the statutory mandate contained in IRC § 267(a)(3) and was invalid. Square D argued in the alternative that, if it were valid, Treasury Regulation § 1.267(a)-3 violated the nondiscrimination clause contained in the Convention Between the United States of America and the French Republic with Respect to Taxes on Income and Property, signed on July 28, 1967 (the "Treaty").

The Tax Court sided with the Commissioner. This was not the first time the Tax Court had considered this issue. Previously, the Tax Court had concluded Treasury Reg-

---

[3] While Square D raised a number of issues before the Tax Court regarding various IRS rulings, the only question remaining in play is when Square D can properly deduct the interest on the loans.

ulation § 1.267(a)-3 was invalid. *See Tate & Lyle, Inc. v. Comm'r of Internal Revenue*, 103 T.C. 656 (1994). However, the Third Circuit reversed the Tax Court, concluding, after a *Chevron* analysis and an examination of the legislative history, that Treasury Regulation § 1.267(a)-3 was not manifestly contrary to the congressional intent expressed in IRC § 267(a)(3). *See Tate & Lyle, Inc. v. Comm'r of Internal Revenue Serv.*, 87 F.3d 99, 106 (3d Cir. 1996). Now, the Tax Court has abandoned its prior view of this regulation (by a 10-6 vote) in light of the Third Circuit's opinion. The Tax Court also found that this regulation did not impose any obligations on Square D that offended the Treaty. Square D appeals.

## II.

As before the Tax Court, Square D presents two challenges to the validity of Treasury Regulation § 1.267(a)-3, which the Commissioner relied on when denying the requested 1991 and 1992 deductions. First, Square D argues that IRC § 267(a)(3) simply directs the Commissioner to implement the matching principle of IRC § 267(a)(2) in the foreign context with no additions or subtractions. Square D contends that Treasury Regulation § 1.267(a)-3 did not follow the congressional imperative contained in IRC § 267(a)(3) and, therefore, did not constitute a reasonable interpretation of the enabling legislation. Square D wants a strict implementation of IRC § 267(a)(2) in the foreign context because of its reading of the matching principle. Square D asserts that because Schneider, a French corporation, cannot be taxed on interest payments, Square D has nothing to "match" against. Therefore, Square D believes that it would be outside the ambit of IRC § 267(a)(2) and could simply take its normal accrual deduction. Square D's

alternative line of attack focuses on the nondiscrimina-
tion clause contained in the Treaty and argues that Treasury
Regulation § 1.267(a)-3 runs afoul of this provision
by imposing burdens on foreign owners of American
companies that do not exist for their American counterparts.

When reviewing decisions of the Tax Court, we review "in
the same manner and to the same extent as decisions of the
district courts in civil actions tried without a jury." IRC
§ 7482(a)(1). We therefore examine questions of law de novo
and factual determinations and the application of legal
principles to the factual determinations for clear error. *See
Baker v. Comm'r of Internal Revenue*, 338 F.3d 789, 792 (7th
Cir. 2003); *Kikalos v. Comm'r of Internal Revenue*, 190 F.3d 791,
793 (7th Cir. 1999) (plenary review of validity of Treasury
regulations); *Fruit of the Loom, Inc. v. Comm'r of Internal
Revenue*, 72 F.3d 1338, 1343 (7th Cir. 1996). We view the
evidence in the light most favorable to the tax court finding.
*See Toushin v. Comm'r of Internal Revenue*, 223 F.3d 642, 646
(7th Cir. 2000).

## A.

We begin our analysis by considering whether Treasury
Regulation § 1.267(a)-3 is a valid regulation pursuant to
*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
467 U.S. 837 (1984). This is a matter of first impression in
this circuit. We recognize that the Third Circuit specifically
dealt with this question in its *Tate & Lyle* decision, eventu-
ally concluding that Treas. Reg. § 1.267(a)-3 was valid. 87
F.3d at 106. As a general matter, "[r]espect for the decisions
of other circuits is especially important in tax cases because
of the importance of uniformity, and the decision of the
Court of Appeals of another circuit should be followed

unless it is shown to be incorrect." *Bell Fed. Savs. & Loan Ass'n v. Comm'r of Internal Revenue*, 40 F.3d 224, 226-27 (7th Cir. 1994) (quoting *Fed. Life Ins. Co. v. United States*, 527 F.2d 1096, 1098-99 (7th Cir. 1975)); *see also 330 W. Hubbard St. Rest. Corp. v. United States*, 203 F.3d 990, 994 (7th Cir. 2000) ("Although we are not bound by them, we 'carefully and respectfully consider' the opinions of our sister circuits.").

The *Chevron* inquiry involves two well-trod analytical steps. First, we must determine whether the plain meaning of the relevant Code provisions either supports or opposes the regulation. *See Bankers Life & Cas. Co. v. United States*, 142 F.3d 973, 983 (7th Cir. 1998); *see also Chevron*, 467 U.S. at 842-43; *Kikalos*, 190 F.3d at 796. If the plain meaning is either silent or unclear as to the regulation's validity, we proceed to the second step and evaluate the reasonableness of the Commissioner's interpretation. *See Chevron*, 467 U.S. at 843; *Kikalos*, 190 F.3d at 796; *Bankers Life*, 142 F.3d at 983. "In the second step, the court determines whether the regulation harmonizes with the language, origins, and purpose of the statute." *Bankers Life,* 142 F.3d at 983; *see also Bell Fed.*, 40 F.3d at 227. As long as a regulation is a reasonable reading of the statute, we give deference to the Commissioner's interpretation. *See Kikalos*, 190 F.3d at 796; *Bankers Life*, 142 F.3d at 987 ("[T]he issue before us is not how we might resolve the statutory ambiguity in the first instance, but whether there is any reasonable basis for the resolution embodied in the Commissioner's Regulation.") (quoting *Fulman v. United States*, 434 U.S. 528, 536 (1978)).

1.

Advancing to the first stage of the *Chevron* analysis, we consider whether the plain meaning of the Code

either clearly supports or opposes Treasury Regulation § 1.267(a)-3. Like the Third Circuit and the Tax Court, we conclude that it does not. *See Tate & Lyle*, 87 F.3d at 104-05; *Square D v. Comm'r of Internal Revenue*, 118 T.C. 299, 307-09 (2002). Square D argues that the Code unambiguously opposes this regulation, grounding its argument on IRC § 267(a)(3), which empowers the Commissioner to enact regulations to implement the matching principle of IRC § 267(a)(2) in the foreign context. Square D takes this language to mean that the Commissioner can do nothing more than just mechanically import the matching principle to issues regarding foreign companies without deviation. By the act of creating regulations that vary from the matching principle, including Treasury Regulation § 1.267(a)-3(c)(2), the Commissioner has violated the plain language of the Code according to Square D.

We disagree. We consider the statutory scheme as a whole when evaluating whether the plain meaning unambiguously opposes or sanctions a particular regulation. *See, e.g., Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132-33 (2000); *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988) ("[I]n ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole.") (internal citations omitted). Square D's reading, that IRC § 267(a)(3) merely authorized the direct implementation of the matching principle to foreign persons without any possible changes, would make that provision redundant. The language of IRC § 267(a)(2) never distinguishes between the foreign and domestic and naturally applies to both, which would seem to make IRC § 267(a)(3)

pure surplusage.[4] *See Tate & Lyle*, 87 F.3d at 104. We read a statute to avoid such redundancy. *See Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 489 n. 13 (2004) ("It is, moreover, a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.") (internal citations omitted); *see also Cole v. U.S. Capital, Inc.*, 389 F.3d 719, 725 (7th Cir. 2004); *United States v. Power Eng'g Co.*, 303 F.3d 1232, 1238 (10th Cir. 2002). The statutory structure, therefore, suggests that IRC § 267(a)(3) does not have the clear meaning that Square D ascribes to it. Since we conclude that the plain language of the Code is ambiguous, we proceed to the second step.

---

[4] Square D attempts to avoid this conclusion by claiming the provision allows for the clarification of various mechanical issues particular to the application of IRC § 267(a)(2) in the foreign context. Square D grounds its argument on legislative history showing that Congress expressed concerns about how to implement IRC § 267(a)(2) in the realm of foreign transactions. As an initial matter, we do not share Square D's enthusiasm for determining whether relevant provisions have a clear and plain meaning by wandering outside the actual statutory language and into the legislative history in the first step of the *Chevron* analysis. *See Bankers Life*, 142 F.3d at 983 (we "lean toward reserving consideration of legislative history and other appropriate factors until the second *Chevron* step."). Moreover, Square D fails to link the general congressional concerns with the actual congressional action. There is no indication that Congress enacted IRC § 267(a)(3) to authorize the Commissioner to deal with assorted ministerial matters, but nothing more. The limited support that the legislative history offers does not convince us that IRC § 267(a)(2) mandates identical treatment for foreign persons.

2.

Arriving at the second step of the analysis, we con-sider whether Treasury Regulation § 1.267(a)-3 was a reasonable interpretation of IRC § 267(a)(3). In cases such as this one in which Congress has made an express delegation of authority to enact regulations, "[s]uch legislative regula-tions are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 844. We assess the reasonableness of Treasury Regulation § 1.267(a)-3 in light of Congress's purpose in enacting the relevant statutes, which requires us, in this situation, to review the legislative history. *See Bankers Life*, 142 F.3d at 983.

Our examination first leads us to the historical landscape surrounding § 267(a)(2). Congress has been working to restrain fraud and abuse from related transactions for nearly seventy years. At first, Congress concentrated on interest transactions and applied a rather strict limitation. Revenue Act of 1937, Pub. L. No. 75-377 § 301(c). Under the 1937 law (which became IRC § 267(a)(2) in 1954), Congress specifi-cally disallowed deductions for interest accrued in a related party transaction between taxpayers with different account-ing methods unless the accrued interest was paid within two and a half months after the close of the taxable year. *Id*. In other words, Congress refused to allow a deduction merely for accruing an interest obligation to a related party; to get the deduction, the taxpayer had to pay the interest within approximately the same taxable year as accrual. In the legislative history, Congress expressed concern that interest payments between related taxpayers with different accounting methods were particularly subject to abuse. In a report on this regulation, for example, the House Ways and Means Committee noted that the government would have

difficulty monitoring when payments were actually made (and thus could be taxed) if an accrual taxpayer took a deduction when accrued, while waiting several years before payment. H.R. Rep. No. 75-1546 (1937), *reprinted in* 1939-1 C.B. (Pt. 2) 704, 724-25. The Committee indicated this could lead to phantom deductions for payments that were either never made or made in a year to minimize the tax burden. *Id.*

In 1984, Congress altered this system somewhat, replacing it with the present version of IRC § 267(a)(2). Despite the changes, Congress explained that the general purpose remained "to prevent the allowance of a deduction without the corresponding inclusion in income." H.R. Rep. No. 98-432 (II), 1025, 1578 (1984), *reprinted in* 1984 (vol.3) U.S.C.C.A.N. 697, 1205. The new version was not primarily focused on interest payments, as in the prior system, having a wider scope to address all payments between related parties with different accounting methods. As described previously, Congress mandated that, in the case of accounting mismatches, deductions for payments to related persons could be taken in the taxable year the payee included the payment.

Two years later, Congress revisited the subject in light of questions about payments to foreign related taxpayers, eventually promulgating IRC § 267(a)(3). As noted earlier, that statutory provision requires the Secretary to "apply the matching principle of [IRC § 267(a)(2)] in cases in which the person to whom the payment is to be made is not a United States person." When addressing this issue, Congress did not limit its consideration to situations involving accounting mismatches between domestic and foreign related parties. *See Tate & Lyle*, 87 F.3d at 105 ("Congress anticipated other reasons for the mismatch of interest and expense income

between related persons"). Rather, in the Committee reports, Congress specifically mentioned a situation in which there was no match at all (as Square D describes its circumstance) because the foreign related party was not subject to American taxes. H.R. Rep. No. 99-426, at 939 (1985), 1986-3 C.B. (Vol. 2) 1, 1939; S. Rep. No. 99-313, at 959 (1986) *reprinted in* 1986-3 C.B. (Vol. 3) 1, 959. *See also Tate & Lyle*, 87 F.3d at 105; *Square D*, 118 T.C. 310-12. The Committee included an example of a foreign company that provided services outside the United States to a related domestic corporation. *See Tate & Lyle*, 87 F.3d at 105; *Square D*, 118 T.C. 311. The reports noted that the foreign parent was "not subject to U.S. tax," but nonetheless concluded that "under the bill, regulations could require the U.S. subsidiary to use the cash method of accounting with respect to the deduction of amounts owed to its foreign parent." H.R. Rep. No. 99-426, at 939; S. Rep. No. 99-313, at 959. *See also Tate & Lyle*, 87 F.3d at 105; *Square D*, 118 T.C. 310-11. "It is clear that Congress anticipated a situation where the required use of the cash method of accounting by the U.S. payor is not based on the foreign payee's accounting method since, in the example, the foreign payee was not subject to U.S. tax on the income received from the related payor." *Tate & Lyle*, 87 F.3d at 105.

Having set this legislative history in place, we can now consider whether the Commissioner acted properly when he drafted the regulation. Like the Tax Court and the Third Circuit before us, we conclude that Treasury Regulation § 1.267(a)-3, which requires the cash method for interest payments to a foreign related party, was reasonable. The legislative history supports the Commissioner's decision to craft regulations addressing payments between related parties even when the foreign related party does not pay American tax. While this is not strictly a difference in

accounting method as mentioned in IRC § 267(a)(2), the Committee notes strongly indicate that Congress had decided that the implementation of the matching principle in the foreign context did not require the foreign person to have something to match against, as Square D argues.[5] *See Tate & Lyle*, 87 F.3d at 105; *Square D*, 118 T.C. 311. Congress considered and sanctioned the use of the cash method as a way to implement the matching principle to solve the problem of payments to a foreign related party. *See Tate & Lyle*, 87 F.3d at 105. This might seem a bit counter-intuitive, but it makes sense when considered against the backdrop of Congress's consistent purpose in drafting these provisions—to prevent potential fraud and abuse by taxpayers. There is no suggestion that Congress determined that these concerns would be alleviated somehow in situations involving tax exempt foreign related parties. *See Square D*, 118 T.C. 311-12. The Commissioner acted reasonably when requiring the cash method to address these types of payments.

Further, the decision to treat interest differently (by requiring the cash method) than other types of transactions between related parties is permissible. The legislative history demonstrates a particular focus on interest payments from the very beginnings of the congressional attempt to regulate this area. The Commissioner tailored the

---

[5]  As previously described *supra* pp. 9-10, Square D contends that the matching principle is inapplicable because Schneider is exempt from American taxes on the interest payments. Square D asserts that the matching principle requires that both parties be subject to American taxes on the payments. Without a corresponding inclusion to pair with a deduction, Square D believes that the matching principle should not apply.

regulation to address a significantly problematic area, which is completely appropriate.

Given the intent of Congress, we find the regulation a reasonable interpretation of the relevant Code provisions, and thus, defer to it.

## B.

Square D also challenges the validity of Treas. Reg. § 1.267(a)-3 based on the Treaty. Treaties have the same legal effect as statutes, *see United States v. Emuegbunam*, 268 F.3d 377, 389 (6th Cir. 2001), and we conduct de novo review of the Tax Court's interpretation. *See UnionBanCal Corp. v. Comm'r of Internal Revenue*, 305 F.3d 976, 981 (9th Cir. 2002).

In this case, Treasury Regulation § 1.267(a)-3 does not conflict with Article 24(3) of the Treaty. That section provides:

> A corporation of a Contracting State, the capital of which is wholly or partly owned or controlled, directly or indirectly, by one of more residents of the other Contracting State, shall not be subjected in the first-mentioned Contracting State to any taxation or any requirement connected therewith which is other or more burdensome than the taxation and connected requirements to which a corporation of that first-mentioned Contracting State carrying on the same activities, the capital of which is wholly owned by one or more residents of the first-mentioned State, is or may be subjected.

This provision simply means "an American subsidiary of a [French] corporation can't be taxed more heavily than an

American subsidiary of an American corporation."
*UnionBanCal Corp.*, 305 F.3d at 986 (addressing a similar
nondiscrimination clause in a U.S.-U.K. tax treaty). Square
D asserts that Treasury Regulation § 1.267(a)-3 runs afoul of
this section because it requires a taxpayer owned by a
French corporation to use the cash method for deducting
interest payments to its parent, rather than the more
advantageous accrual method.

While this argument has some initial appeal, it comes
up short. In order to violate a nondiscrimination clause
in a treaty, the additional burden must be directed at
nationality. *See* Klaus Vogel, *Klaus Vogel on Double Taxation Conventions* 1290 (3d ed. 1997). Put differently, "discrimination against foreign-owned subsidiaries is all that
the nondiscrimination clause at issue protected it against."
*See UnionBanCal Corp.*, 305 F.3d at 986. Such discrimination
is absent here. The regulation requires that all interest
payments to a foreign related party must use the cash
method of accounting without regard to the nationality
of the owner. The regulation does not impose the cash
method simply because of foreign ownership, which
would be prohibited, but rather for payments to a foreign related party. Even if a corporation were owned by
a United States parent, it still appears all interest payments to one of these foreign related parties would lead
to the use of the cash method. The requirement, therefore,
hinges on the nationality of the related party to whom
the payment goes and does not fluctuate based on nationality of the ultimate owner. It is merely fortuitous
that, in this case, the foreign related party to which the
payment was made also happened to be the owner. The
regulation does not discriminate based on foreign ownership, and thus, does not violate the nondiscrimination
clause.

### III.

The Commissioner properly concluded that Square D had to take deductions for payments to a foreign related party based on the cash method, rather than the accrual method. Treasury Regulation § 1.267(a)-3, on which the Commissioner relied, was a reasonable interpretation of ambiguous statutory provisions. Likewise, the nondiscrimination clause in the applicable treaties does not prohibit this regulation, as it does not place additional burdens on French-owned corporations. The judgment of the Tax Court is AFFIRMED.

A true Copy:

      Teste:

 

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*