In the

# United States Court of Appeals
## For the Seventh Circuit

No. 14-2776

VLM FOOD TRADING
INTERNATIONAL, INC.,

*Plaintiff-Appellant,*

*v.*

ILLINOIS TRADING COMPANY,
THE OBEE FAMILY PARTNERSHIP,
and LAWRENCE N. OBERMAN,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 12 C 8154 — **Harry D. Leinenweber**, *Judge.*

ARGUED FEBRUARY 24, 2015 — DECIDED JANUARY 21, 2016

Before EASTERBROOK, ROVNER, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* This contract dispute between plaintiff VLM Food Trading International, Inc., a Canadian agricultural supplier, and defendant Illinois Trading Company, an Illinois produce reseller, comes to us for a second time. (Illinois Trading is not the only defendant; its president and

a controlling partnership are also named.) The issue in the first appeal was whether the United Nations Convention on Contracts for the International Sale of Goods applies to the parties' dispute. We held that it does. *VLM Food Trading Int'l, Inc. v. Illinois Trading Co.* ("*VLM I*"), 748 F.3d 780 (7th Cir. 2014). On remand the district court ruled that under the Convention a contested attorney's fees provision in VLM's trailing invoices was not a part of the parties' contracts and granted summary judgment accordingly.

On appeal VLM challenges the judge's analysis of the attorney's fees provision under the Convention. VLM also takes issue with the judge's decision to give two of the three defendants the benefit of this ruling even though an order of default had been entered against them.

We reject these arguments and affirm. The district judge correctly held that because Illinois Trading never expressly assented to the attorney's fees provision in VLM's trailing invoices, under the Convention that term did not become a part of the parties' contracts. We also uphold the judge's finding that VLM waived its right to rely on the entry of default by failing to raise the issue until its reply brief on remand.

## I. Background

VLM is a Montreal-based agricultural supplier. Illinois Trading is a reseller of agricultural produce. We laid out the full history of this litigation in *VLM I*, s*ee id.* at 782–84, and recount the relevant facts for purposes of this second appeal.

Starting in June 2012, VLM sold frozen potatoes to Illinois Trading through nine separate transactions without incident. Illinois Trading then encountered financial difficulty

and failed to pay for the next nine shipments from VLM. The parties agree that each transaction occurred the same way. First, Illinois Trading sent a purchase order specifying the item, quantity, price, and place of delivery for the potatoes. Second, VLM responded with an e-mail confirming the terms of the sale. Third, VLM shipped the order and Illinois Trading accepted it. Finally, VLM followed up by mail with an invoice. Importantly for us, the trailing invoices included a provision purporting to make Illinois Trading liable for interest and collection-related attorney's fees if it breached the contracts.

When Illinois Trading stopped paying its invoices, VLM sued Illinois Trading; the Obee Family Partnership, which controlled Illinois Trading; and Lawrence Oberman, Illinois Trading's president. The defendants' first lawyer made an appearance but then withdrew. The defendants failed to hire another attorney in a timely fashion, and the deadline for filing an answer to VLM's complaint came and went. Therefore, on January 12, 2013, the district court granted a motion by VLM for an entry of default against Illinois Trading, the Partnership, and Oberman.

After belatedly securing new counsel, the defendants moved to vacate the entry of default. On February 12, 2013, the judge held a hearing and vacated the default as to Oberman only. All three defendants then filed an answer, even though Illinois Trading and the Partnership had been deemed in default. The answer admitted that the defendants owed VLM the purchase price for the produce plus interest but contested liability for attorney's fees. After a hearing on that issue, the judge applied Illinois's version of the Uniform

Commercial Code and found that the attorney's fees provision had been incorporated into the parties' agreement.

We reversed, holding that the U.N. Convention on Contracts for the International Sale of Goods applies. *VLM I*, 748 F.3d at 787. On remand the judge applied the Convention and held that the attorney's fees provision was *not* part of the contracts. The judge also found that Illinois Trading and the Partnership could benefit from this ruling, despite the prior entry of default, because VLM waived the right to rely on the default by its litigation conduct before the first appeal and by failing to raise the default issue until its reply brief on remand.

## II. Discussion

### A. Attorney's Fees Under the Convention

As we've explained, the last time this case was here, we resolved a choice-of-law question and held that the Convention controls the interpretation of the parties' contracts. So our first question on this new appeal is whether the district judge correctly concluded that under the Convention the attorney's fees provision was not incorporated into the parties' contracts. We review de novo a district court's interpretation of a contract. *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 763 (7th Cir. 2010). Treaties have the same legal effect as statutes, and therefore a district court's interpretation of a treaty is reviewed de novo as well. *Square D Co. & Subsidiaries v. Comm'r*, 438 F.3d 739, 747 (7th Cir. 2006).

The Convention's definition of the "loss" resulting from a breach of contract does not itself include attorney's fees. *See* United Nations Convention on Contracts for the International Sale of Goods art. 74, Apr. 11, 1980, 1489 U.N.T.S. 3;

52 Fed. Reg. 6262 (Mar. 2, 1987) ("Damages for breach of contract by one party consist of a sum equal to the loss, including loss of profit, suffered by the other party as a consequence of the breach."); *see also Zapata Hermanos Sucesores, S.A. v. Hearthside Baking Co.*, 313 F.3d 385, 389 (7th Cir. 2002) (finding the allocation of legal fees to be a procedural issue not addressed in the Convention itself and therefore applying the appropriate domestic law). To succeed, VLM must show that its contracts with Illinois Trading *expressly* made Illinois Trading liable for VLM's attorney's fees in the event of a breach. To determine whether the fees provision was expressly accepted by Illinois Trading, we need to know when the terms of their agreement became binding.

A contract is formed under the Convention when there is a valid offer and acceptance. An offer is valid if it is "sufficiently definite and indicates the intention of the offeror to be bound in case of acceptance." Convention art. 14(1). An offer is "sufficiently definite" if it "indicates the goods and expressly or implicitly fixes or makes provision for determining the quantity and price." *Id*. Once a valid offer has been extended, the offeree can accept by words or conduct, but not by silence or inactivity. *Id.* art. 18(1). An acceptance "becomes effective at the moment the indication of assent reaches the offeror." *Id*. art. 18(2). Acceptance can also be demonstrated through the offeree's conduct, if allowed "as a result of practices which the parties have established between themselves or of usage." *Id*. art. 18(3).

So far so good—these contract principles are familiar and very similar to those expressed in the UCC. But as we noted in *VLM I*, the Convention departs dramatically from the UCC by using the common-law "mirror image" rule (some-

times called the "last shot" rule) to resolve "battles of the forms." 748 F.3d at 785–86; *see also Roser Techs., Inc. v. Carl Schreiber GmbH*, No. 11cv302 ERIE, 2013 WL 4852314, at *5 (W.D. Pa. 2013) ("[W]ith respect to the battle of the forms, the determinative factor under the [Convention] is when the contract was formed. The terms of the contract are those embodied in the last offer (or counteroffer) made prior to a contract being formed."). Under the mirror-image rule, as expressed in Article 19(1) of the Convention, "[a] reply to an offer which purports to be an acceptance but contains additions, limitations or other modifications is a rejection of the offer and constitutes a counter-offer."[1]

Each Illinois Trading purchase order met all the Convention's criteria for an offer; they included sufficiently definite terms, were directed to VLM specifically, and indicated that Illinois Trading intended to be bound by VLM's acceptance. *See* Convention art. 14(1). Each of VLM's confirmation e-mails was, in turn, an effective acceptance of Illinois Trading's offer because each one confirmed and accepted the terms of the purchase order. *Id*. art. 18(1).[2] As such, the contracts were formed when Illinois Trading received VLM's confirmation e-mails. *Id*. art. 18(2). The attorney's fees provision was *not* part of the agreement described in the purchase orders and the e-mail confirmations; that term first appeared in the trailing invoices that were mailed to Illinois Trading

---

[1] Although Article 19(2) makes an exception for nonmaterial alterations to terms, Article 19(3) defines "materiality" broadly to include terms relating to price, payment, quantity, delivery, the "extent of one party's liability," or the settlement of disputes. Convention art. 19.

[2] Even if there were no e-mail confirmations, VLM's delivery of the potatoes would have constituted an acceptance by conduct. *See id.* art. 18(1).

*after* VLM delivered the produce.

Under the Convention VLM had already bound itself to the contracts proposed by Illinois Trading when it confirmed Illinois Trading's purchase offer by e-mail. The attorney's fees provision therefore could not have been a counteroffer. Rather, as we said in *VLM I*, "[i]f the contracts were formed *before* Illinois Trading received VLM's invoices—possibly via Illinois Trading's purchase orders and VLM's e-mail confirmations—then the attorney's fees and interest provisions would be proposed modifications to the contracts." 748 F.3d at 786. Under the mirror-image rule, a party does not have to object to a proposed modification in order to keep it from being incorporated; any term that is not "mirrored" in the offer and acceptance is excluded. Contracts can only be modified by agreement of the parties, Convention art. 29(1), and a party cannot accept an offer (including one for modification) by silence or inactivity, *id*. art. 18(1). Rather, a party can only accept an offer through statements or conduct (if the parties' course of dealings allow for it). *Id*.

Illinois Trading never made any statements indicating its acceptance of the proposed attorney's fees modification. Indeed, the only possible activity that could have indicated Illinois Trading's acceptance of the proposed modification was its payment of the invoices. But that conduct is just as consistent with Illinois Trading's obligations under the original agreement as it is with any new acceptance. Furthermore, since VLM had already completely performed its duties under the original proposed agreement, it had no performance left to offer in consideration for any (gratuitous) agreement by Illinois Trading to assume liability for VLM's attorney's fees in the event of breach. *See Contempo Design,*

*Inc. v. Chicago & Ne. Ill. Dist. Council of Carpenters*, 226 F.3d 535, 550 (7th Cir. 2000) ("Indeed, the basic requirement that a contract needs consideration to be enforceable has a distinct function in this area of contract modification, a function very important in a case such as this one: to prevent coercive modifications.").

Few American cases interpret the Convention, but those that exist support the conclusion that the contracts at issue here were formed by Illinois Trading's purchase orders and VLM's e-mail confirmations. Two previous cases involving forum-selection clauses are illustrative. In *Château des Charmes Wines Ltd. v. Sabaté USA Inc.*, 328 F.3d 528, 529 (9th Cir. 2003), the buyer made two oral contracts with the seller for wine corks. The corks were delivered in 11 shipments, and the seller sent separate invoices containing a forum-selection clause. Sometimes the invoice would arrive with the shipments, sometimes before, and sometimes after. *Id*. The Ninth Circuit held that the forum-selection clause was *not* part of the contracts because the oral agreements had been sufficient to create complete and binding contracts, and "[n]othing in the Convention suggests that the failure to object to a party's unilateral attempt to alter materially the terms of an otherwise valid agreement is an 'agreement.'" *Id*. at 531.

Likewise, in *Solae, LLC v. Hershey Canada, Inc.*, 557 F. Supp. 2d 452, 457 (D. Del. 2008), the court concluded that the parties reached a binding contract after they agreed to the key terms of the deal. The court held that the forum-selection clause printed on the seller's trailing invoice could not modify that contract, even though the buyers had received the same invoices with the same forum-selection

clause for years prior to the dispute. *Id*.[3]

VLM contends that despite the contract-formation analysis prescribed by the Convention, the parties subjectively intended the attorney's fees provision to apply. In VLM's view the Convention "commands" judges to consider extrinsic evidence to illuminate the parties' intent. This argument relies largely on Article 8(3), which reads: "In determining the intent of a party … [,] due consideration is to be given to all relevant circumstances of the case including the negotiations, any practices which the parties have established between themselves, usages and any subsequent conduct of the parties." But the purpose of this intent test is to help courts interpret the statements and conduct of parties "according to [their] intent where the other party knew … what that intent was." Convention art. 8(1). Although VLM's conduct—sending trailing invoices containing an attorney's fees provision—clearly indicates that *VLM* intended Illinois Trading to be liable for collection fees, there was never any indi-

---

[3] We are aware of one "battle of the forms" case under the Convention in which the court found that the parties agreed to a new contract provision. In *Filanto, S.p.A. v. Chilewich International Corp.*, 789 F. Supp. 1229, 1240 (S.D.N.Y. 1992), the two parties had a lengthy course of dealing. At one point Chilewich had made an offer to Filanto to incorporate by reference a separate agreement that included a promise to arbitrate future disputes. *Id*. at 1230–31. Filanto accepted performance for several months before objecting. *Id*. at 1240. The court found that "Filanto was certainly under a duty to alert Chilewich in [a] timely fashion to its objections[,] … particularly since Chilewich had repeatedly referred [Filanto] to the [offer document] and Filanto had had a copy of that document for some time." *Id*. *Filanto* is distinguishable for several reasons, including the fact that Illinois Trading never relied on other provisions from VLM's invoices in subsequent contracts or litigation and Illinois Trading never signed the invoices. *See id.* at 1241.

cation of *mutual* intent at the time of contracting. Fee-shifting was never mentioned during any negotiations, and none of Illinois Trading's subsequent conduct indicates that it agreed to pay VLM's attorney's fees.

Furthermore, VLM has not presented any evidence of Illinois Trading's subjective intent to be bound by the attorney's fees provision. Oberman testified that he had never seen the provision before the start of this litigation, and it was never discussed during contract negotiations or at any other point. The only person at Illinois Trading who knew about it was Illinois Trading's bookkeeper, who processed the invoices. But this is weak evidence of Illinois Trading's subjective intent. *See CSS Antenna, Inc. v. Amphenol–Tuchel Elec., GmbH*, 764 F. Supp. 2d 745, 754 (D. Md. 2011) (The "General Conditions" printed on the seller's order confirmation form were not incorporated into the contract under the Convention because, *inter alia*, "[t]he record shows that [the seller] sent its purchase confirmation forms directly to [the buyer's] billing department, where no one with authority to enter into, modify, or otherwise accept any contracts worked. … General Conditions were never discussed during their negotiations[,] and [the buyer's executives] did not become aware of them until the defendant filed its motion to dismiss."). And given the Convention's mirror-image rule, Illinois Trading's failure to object to the previous invoices is irrelevant because "a party's multiple attempts to alter an agreement unilaterally do not so effect." *Châteu des Charmes*, 328 F.3d at 531.

VLM also points to Article 9(1), which says that "parties are bound to any usage to which they have agreed and by any practices which they have established between them-

selves." This clause doesn't help for two reasons. First, there simply isn't any established "practice" between Illinois Trading and VLM regarding liability for attorney's fees. Yes, there's a history of VLM printing the fee-shifting provision on invoices sent to Illinois Trading after delivery, but—as we've already observed—there's no history of Illinois Trading acknowledging or accepting this provision as required under the mirror-image rule. Second, evidence of "usage" comes into play to clarify the meaning assigned to a contract term ("usage" is listed in parallel and in contrast to "practices" in Article 19(1)). Here, no contract term is ambiguous and thus in need of clarification by evidence of usage. In other words, there's no disagreement about what the attorney's fees provision *means*; the only issue is whether it was part of the parties' agreement. *Cf. St. Paul Guardian Ins. Co. v. Neuromed Sys. & Support, GmbH*, No. 00 CV 9344(SHS), 2002 WL 465312, at *4 (S.D.N.Y. Mar. 26, 2002) (relying on industry practice to interpret the meaning of an ambiguous term in an uncontestably valid contract).

VLM also relies on *MCC–Marble Ceramic Center, Inc. v. Ceramica Nuova d'Agostino*, 144 F.3d 1384, 1385 (11th Cir. 1998), but that case doesn't help it either. In *MCC–Marble* the court had to construe the terms of an oral agreement that was later memorialized by a form, written in Italian and provided by one of the parties, setting forth that party's standard terms. Under these circumstances, the Eleventh Circuit looked to the parties' negotiations and conduct to evaluate the discrepancies between the oral and written agreements. *Id*. at 1389. Here, however, the timing and terms of Illinois Trading's offer and VLM's acceptance—both of which were in writing—are clear. *MCC–Marble* is inapposite.

Finally, the fact that some of Illinois Trading's contracts with other vendors included fee-shifting provisions is not relevant under the mirror-image rule, nor is the fact that Illinois Trading paid attorney's fees as part of its settlements with certain vendors. Nothing in the Convention indicates that common industry practices are automatically grafted onto contracts; rather, the content of each contract must be analyzed independently. Accordingly, the district judge's earlier decision (long since reversed) that fee-shifting is a standard industry practice has no relevance here.

For all these reasons, the judge properly applied the Convention and held that the parties' contracts did not include the attorney's fees provision.

## B. VLM's Waiver of the Entry of Default

But may Illinois Trading and the Partnership benefit from this ruling? The judge initially entered default against them but on remand held that VLM waived the right to rely on the entry of default. Orders setting aside an entry of default are reviewed for abuse of discretion. *O'Brien v. R.J. O'Brien & Assocs., Inc.*, 998 F.2d 1394, 1402 (7th Cir. 1993).

The question of default in this case is a bit confused. The parties and the district court refer to a "default judgment" against Illinois Trading and the Partnership, but it's far from clear that a default *judgment* was ever formally entered in this case. The confusion could have been avoided if the parties and the court had more strictly adhered to the principle that "[t]here are two stages in a default proceeding: the establishment of the default, and the actual entry of a default judgment. Once the default is established, and thus liability, the plaintiff still must establish his entitlement to the relief he seeks." *In re Catt*, 368 F.3d 789, 793 (7th Cir. 2004). This

two-step process is clearly outlined in Rule 55(a) (entry of default) and Rule 55(b) (default judgment) of the Federal Rules of Civil Procedure. The basic effect of an entry of default (step one) is that "[u]pon default, the well-pleaded allegations of a complaint relating to liability are taken as true." *Dundee Cement Co. v. Howard Pipe & Concrete Prods., Inc.*, 722 F.2d 1319, 1323 (7th Cir. 1983). The defaulting party cannot contest the fact of his liability unless the entry of default is vacated under Rule 55(c). *See* 10 JAMES W.M. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 55.32[1][a] (3d ed. 2013) ("The effect of an entry of default, if not set aside, is to establish the liability of the defaulting party as a basis for default judgment. After defaulting, a party has no right to dispute the issue of liability."). At the same time, however, the *entry* of default "does not of itself determine rights." *United States v. Borchardt*, 470 F.2d 257, 260 (7th Cir. 1972). That role is reserved for a default *judgment*. Here, there was an entry of default, but not a default judgment.[4]

Moreover, on remand the judge found that VLM waived its right to rely on the entry of default against Illinois Trad-

---

[4] VLM filed a "Motion for Entry of Default" that specifically invoked Rule 55(a). In response the judge granted the motion for "entry of default," not a default judgment. VLM, in turn, never "appl[ied] to the court for a default judgment" as required by Rule 55(b)(2), and, regardless, the hearing at which the judge entered the default was held less than seven days after VLM had filed its 55(a) motion, below the minimum time period allowed under Rule 55(b)(2) between a request for default judgment and the entry of such judgment. FED. R. CIV. P. 55. Indeed, at a hearing held just a few days after the entry of default, a lawyer representing an unrelated defendant (the Transportation Alliance Bank) correctly stated that "[t]here was an entry of default, but I don't believe there's been an entry of judgment."

ing and the Partnership. This finding rested on statements made by VLM's lawyer at the February 12, 2013 hearing (before the first appeal) and on VLM's failure to raise the default issue in its opening brief on remand.

At the February 12 hearing, VLM's lawyer discussed "narrow[ing] next week's [merits] hearing to just the attorney's fees issue instead of running up the principal and the interest all over again when that's already been admitted in the record now." This statement doesn't shed much light on the default question. It's possible that VLM's lawyer was assuming that only Oberman could contest liability for attorney's fees and the other defendants were limited to challenging the *amount* of the fees. On the other hand, perhaps the parties and the court were proceeding on the assumption that all three defendants could contest liability for fees as well as the amount. This statement simply doesn't permit an inference one way or another. Without more, we cannot conclude from this single statement alone that VLM "*intentionally* relinquished" a known right. *King v. Kramer*, 763 F.3d 635, 641 (7th Cir. 2014).

But the second source of waiver identified by the judge adds something more to the analysis. VLM never mentioned the default issue in its opening brief to the district court on remand. Instead, VLM waited until its reply brief to raise the default issue. In the judge's view, that was too late to give Illinois Trading and the Partnership notice of the argument and an opportunity to respond.

As a general matter, it's possible to waive questions of a defendant's default status. *See, e.g., Dreith v. Nu Image, Inc.*, 648 F.3d 779, 790 (9th Cir. 2011) ("[B]y choosing in the district court not to avail themselves of Rules 55(c) and 60(b),

and electing in their papers filed with Judge Wilson not to 're-argue the propriety of the default itself,' the Companies can be charged with intentionally and tactically relinquishing known rights—which is normally called 'waiver'—with respect to the order of default."); *Ciccarello v. Jos. Schlitz Brewing Co.*, 1 F.R.D. 491, 493–94 (S.D. W. Va. 1940) (holding that the plaintiff's consent to the defaulted defendant's requests for continuances constituted a waiver of the default under West Virginia law).[5] We think the judge reasonably concluded that VLM waived its right to rely on the earlier entry of default by waiting until its reply brief on remand to raise the issue.[6]

---

[5] *See also* 49 C.J.S. *Judgments* § 276 (2014) ("A waiver of the right to judgment following a default need not be express, but may be implied in law by conduct or circumstances inconsistent with the right. A plaintiff will be held to have waived the defendant's default where the plaintiff voluntarily extends the time for the defendant to plead or appear, or goes to trial without objection, accepts a pleading filed out of time, or files a replication to a pleading so filed.") (footnotes omitted); James L. Buchwalter, Annotation, *Waiver of Right to Default Judgment*, 64 A.L.R.5th 163 (1998) ("The moving party, typically a plaintiff, … may waive the right to a default judgment by performing certain actions, or failing to do certain actions, that demonstrate an intentional relinquishment of the right to judgment.").

[6] An alternative rationale appears to provide additional support for this result. In *Frow v. De La Vega*, 82 U.S. 552, 554 (1872), the Supreme Court held that it would be "unseemly and absurd, as well as unauthorized by law," for a default judgment to be entered against one defendant if his codefendants, who were jointly liable, were cleared on the merits. We have applied this rule on several occasions. *See Home Ins. Co. of Ill. v. Adco Oil. Co.*, 154 F.3d 739, 741 (7th Cir. 1998) (The lower court's mistake was to enter a "default *judgment* against [the defaulter], as opposed to a notation of default. In a suit against multiple defendants a default judgment should not be entered against one until the matter has been resolved as

AFFIRMED.

---

to all."); *Douglas v. Metro Rental Servs., Inc.*, 827 F.2d 252, 255 (7th Cir. 1987); *In re Uranium Antitrust Litig.*, 617 F.2d 1248, 1257–58 (7th Cir. 1980). Because the *Frow* rule wasn't raised here, however, we do not rely on it.